PAUL SHAW, Appellee, v. FRANK CARSON, JR., Appellant.

No. 42470.

NOVEMBER 13, 1934.

Dutcher, Walker & Ries, and Daniel C. Dutcher, for appellant.

Edward F. Rate and C. B. Russell, for appellee.

MITCHELL, C. J.—For years the courts have been confronted with questions involving the law of the land and the law of the sea and now, for the first time, this court is confronted with a case involving the law of the air.

Paul Shaw, the appellee in the case at bar, conducted a flying school at the municipal airport in Iowa City. Frank Carson, Jr., the appellant, took a course of flying instructions from Shaw, which was completed on November 6, 1930, and, after passing certain tests required by the government, he was granted a private license, which is the same as a transport license except the holder cannot haul passengers for hire or instruct students. Following the issuance of the license, Carson continued to do some flying, using generally the planes belonging to Shaw. In August of 1932 Shaw and Carson entered into an arrangement whereby Carson agreed to pay Shaw the sum of $100 for ten hours of flying time in the airplanes belonging to Shaw. It seems that $100 is a rather low price to pay for the privilege of flying ten hours in the air. In addition to the cash payment of $100, Carson agreed to help Shaw at various fairs and exhibitions where Shaw was working, selling rides to prospective customers who desired to realize the thrill of an airplane ride. It is the appellee's contention he informed Carson that he would have to be responsible for damages sustained to the plane while he was flying. On the 1st day of December, 1932, Carson asked Shaw if he could use the airplane known as the "Eagle Rock" biplane, and Shaw consented he might use it for not over fifteen minutes. Carson was informed there was not much gas in the main tank and told to turn on the reserve tank, which he did. It is the claim of the appellee that he told the appellant before he took off from the field not to fly over the city of Iowa City and at all times to stay within gliding distance from the airport. The gliding distance is the distance which a given plane could glide from any given altitude, with the engine not working. The appellant cranked the airplane motor, jumped into the pilot's seat, and took off from the airport, and proceeded almost due north on the east side of the Iowa river, to a point almost 2,000 feet in the air, over what is known as "Green Gables Inn", which is about 3 miles north of the airport. When he reached the point about 2,000 feet above the Green Gables

Inn, his motor started sputtering, alternately dying down and coming back to life. Realizing the motor was not working properly and that his safety and the safety of the airplane depended upon the ability of the motor to run, Carson headed his ship back towards the airport. As he came back, due to motor trouble, the airplane was steadily losing altitude. At a point almost over the smokestacks of the Hydraulic Laboratories, which are on the east side of the Iowa river in the city of Iowa City, Carson turned his plane and went directly west towards the Finkbine golf course, which is on the west side of the Iowa river. At the time he turned west to land on the golf course, he was eight or nine hundred feet in the air, the motor was working improperly, and the plane was continually losing altitude. Carson passed directly over the University Hospital, south of the tower, and at that point was so low he had to keep on one side or other of the tower. Proceeding west across the first fairway of the golf course, he turned the plane to the left, and, in landing, the left wing caught in an evergreen tree and the airplane nosed into the ground, breaking the propeller and damaging the plane.

The appellee commenced suit against Carson, seeking to recover the amount of the damages to his plane, which he alleged to be in the amount of $2,020. The first two counts of the petition were based upon the agreement of the appellant that he would be responsible and pay for damages sustained by the airplane while it was in his complete charge. On the motion of the appellant, these two counts were withdrawn from the jury because the said Frank Carson, Jr., was a minor at the time of the alleged making of the contract and incapable of entering into an enforceable agreement, it appearing in the record without dispute that Frank Carson, Jr., was nineteen years of age. In the third count of the petition the appellee sought to recover damages because of the negligent operation of the plane. The court submitted the following three grounds of negligence, to wit: First, the failure of the appellant properly to make an emergency landing upon available emergency landing field as soon as the plane commenced to misfire; second, that after the motor commenced to misfire the appellant conducted the airplane over the city of Iowa City, the Finkbine golf course, and then negligently and carelessly failed to land his airplane on one of the available emergency landing areas; third, that at the time appellant reached a point over the golf course the motor began to function

normally, and at that time no emergency landing was necessary. The case was submitted to a jury, which returned a verdict in favor of the appellee in the amount of $1,000, plus interest and costs.

Frank Carson, Jr., being dissatisfied with the verdict of the jury, has appealed to this court.

The record shows that Frank Carson, Jr., was a young man nineteen years of age at the time of the accident. That he was ambitious to become a flyer, and that he took lessons from Paul Shaw, the appellee, who operated a flying school at the municipal airport in Iowa City. The course of instruction consisted of taking Carson into the air and showing him how to keep the ship level; then showing him how to make turns, and then instructing him in making landings and takeoffs. The difficult part of flying an airplane, it appears, is in getting it off the ground and then back onto the ground. Carson proved to be a good student. After completion of his training course, he made arrangements for taking his test for a license, the license being issued by the department of commerce after passing the test, which Carson successfully did. In the training course the student is taught that the first thing a flyer of a plane must do is to preserve life, and that as he is flying along through the air, listening to the hum of the motor, he must keep a continual lookout for an emergency landing field, for the ability of the plane to stay in the air and maintain its altitude depends upon the motor that is pulling the plane. If the motor fails to work properly, then the plane will rapidly lose altitude and the pilot must prepare to land the plane, regardless of where he is. And so the pilot is trained to keep his eye peeled for what is known as an emergency landing field. An emergency landing field, or emergency landing area, according to the record, is any area that the plane could possibly be landed into with or without a motor. It should be from five hundred to a thousand feet in length, depending upon the obstructions around it, and the width is not so important although it should be at least two or three times that of the plane. It is not necessary that the field be absolutely smooth, but, of course, it is desirable. In landing a plane it should be landed against the wind, or, in other words, the plane is headed into the wind. An emergency landing is, of course, always a difficult matter. The more experienced pilot is able to set his plane down when the motor is dead, in an emergency landing field with less difficulty than the young, inexperienced flyer. Carson was a young, inexperienced flyer. This was his first emerg-

ency landing. He had never before been confronted with the necessity of picking out from a distance of 2,000 feet in the air a place to land his plane, with a motor that was not functioning properly. Carson secured permission on December 1, 1932, to use the plane belonging to the appellee. He took off from the airport, proceeding north a distance of approximately 3 miles, to a position some 2,000 feet in the air, over what is known as "Green Gables Inn". When he reached this point, his motor started to miss. He turned the plane and headed it towards the airport. At times the motor would pick up, and he proceeded until he was at a point over what is known as the Hydraulic Laboratories, when it appeared to Carson that it would be impossible for him to reach the airport, and so he turned the airplane westward and headed for the golf course. At the time he turned west, according to Carson he was somewhere between eight and nine hundred feet in the air and the motor was working improperly, and as a result the plane was losing altitude continually. In order to reach the golf course, he had to pass the University Hospital. As he neared the fairway on the golf course where he intended to land, he saw some people on it and so he continued on a little further west and then tried to get on what is known as the first fairway. By this time, according to Carson, he had lost his flying speed and it was time to land the plane. As he attempted this landing, one of the wings of the plane caught in a tree that was about 6 feet high, tipping the plane and nosing it down instead of permitting it to come down as it should have, on its two wheels. The plane was severely damaged.

Many errors are complained of by the appellant. It is necessary for us to consider but one. The court submitted to the jury as one of the grounds of negligence the following:

"That at the time the defendant reached a point over the golf course the motor began to function normally, and at that time no forced landing was necessary."

The appellee's witnesses who saw the plane as it neared the golf course all testified that the motor was not working properly. The appellant himself testified that the motor had stopped running, and his witnesses bore him out in this contention. Even the appellee in his brief and argument concedes that the motor was not working properly, when he said in the following words:

"There was indirect evidence of experts that from the condition of the propeller after the accident it must have been turning up one-half or one-quarter."

Certainly, in view of such evidence, it could not be said that the motor was working normally. If the motor was working normally, then, of course, there was no excuse for the smash-up, for the appellant could have proceeded on to a proper landing field, which was within a short distance, it appearing from the record that there were several good emergency landing areas on the golf course. There is not in the record evidence of any witness to show that the motor was working normally at the time Carson attempted to make the landing on the golf course. There being no evidence of the negligence which the court submitted to the jury, it was error on the part of the court to submit as one of the grounds of negligence that the motor was working normally.

And the judgment and decree of the lower court must be, and it is hereby, reversed.

STEVENS, ANDERSON, CLAUSSEN, and KINTZINGER, JJ., concur.