## STATE OF MARYLAND, TO USE OF IRMA A. BIRCKHEAD, *v.* JAMES S. SAMMON ET AL.

[No. 16, October Term, 1936.]

*Decided November 19th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Rieman McIntosh* and *Robert Stinson,* with whom was *Stuart S. Janney* on the brief, for the appellant.

*Norwood B. Orrick,* with whom were *Venable, Baetjer & Howard* on the brief, for James S. Sammon, appellee.

*Robert D. Bartlett,* submitting on brief, for Baltimore Air Terminals, appellee.

*John H. Hessey,* with whom were *Musgrave, Bowling & Hessey* on the brief, for Baltimore Flying Service, appellee.

*Clarence A. Tucker,* with whom were *Knapp, Tucker & Thomas* on the brief, for Hochschild, Kohn & Company, appellee.

URNER, J., delivered the opinion of the Court.

As two boys were riding their bicycles, on the afternoon of April 7th, 1935, across the flying field of the Curtiss-Wright Airport near Baltimore, along the course of a formerly used road, the rider in the lead was struck and killed by an airplane as it was gliding to the ground. The mother of the boy who was the victim of the tragedy brought this suit against Captain James S. Sammon, who owned and was operating the airplane, and also against Baltimore Air Terminals, Inc., the owner and lessor of the airport, Baltimore Flying Service, Inc., its lessee, and Hochschild, Kohn & Co., Inc., a corporation which had advertised and conducted a toy balloon contest at the airport on the day of the accident. The declaration alleges that the defendants were jointly negligent in failing to take proper precautions against such a misadventure as the one by which the plaintiff's son lost his life. The suit ended in a judgment of *non pros.* as to Baltimore Air Terminals, Inc., after its separate demurrer to the declaration had been sustained and the plaintiff had not taken advantage of a leave to amend. At the trial of the issues joined on the pleas of the other defendants, a directed verdict was rendered in favor of Baltimore Flying Service, Inc., and Hochschild, Kohn & Co., when the testimony for the plaintiff was concluded, and the case was also withdrawn from the jury as to Captain Sammon when evidence in his behalf and in rebuttal had been presented. The only exceptions in the record were taken because of the instructions which exempted those three defendants from the liability charged in the declaration.

The Curtiss-Wright Airport occupies an area about 1,400 yards in length and breadth between Smith Avenue on the north, Clark's Lane on the south and west, and Greenspring Avenue on the east. There is an entrance to the airport from Smith Avenue, near which the hangars are located. Clark's Lane originally extended across the ground now used for the airport, but in order that the area might be made available for that purpose,

the course of the lane was diverted to the south and west. After its abandonment, however, as a public thoroughfare, that portion of the lane which intersected the land acquired for the airport was not obliterated, but at the time of the accident was an apparently usable roadway. It led from Clark's Lane northwardly towards the hangars. The two boys were riding along the road in that direction and had passed over the field for more than half of its width when the accident occurred. The airplane involved in it had circled the field, and, after making a turn about a mile to the west, was gliding eastwardly to its landing.

From the testimony of the plaintiff's first witness we quote as follows:

"I was at the airport at Smith Avenue on the day of the accident. * * * I was there in my car with my wife and family, about one hundred feet west of the westernmost hangar on the northern edge of the field, facing south, and I saw the accident happen. My wife and I were seated in my car, and my wife called my attention to two boys who were proceeding roughly northward across this field, and I looked up and saw an airplane coming in for landing. Something told me an accident was going to be inevitable, and I stepped out of the car and just as I did the plane struck the boy. I ran out on the field, reached him I suppose within a minute after the plane struck him, and looked the boy over and saw that he was dead. * * * The boy who was killed was in the lead. * * * Subsequently I went to the field and located where the accident took place and made some measurements of distances from the place of the accident. Pacing it off I decided it was about 325 yards from the extreme western edge of the field to the point of impact where the boy was struck. It was 350 yards from the back entrance of the field to the point where the boy was struck, that is as the road runs not on a direct line. * * *

"(The Court) Now what road is that? A. That is the road which crosses the airport on which the boy was traveling when he was struck. * * *

"Q. Were there any automobiles on the other side of the field from where you were? A. Yes, sir. They were pretty generally scattered over the southern boundary of the field. * * *

"Q. Now you speak of a well defined road. Do you mean at the end where the airport hangars are? A. No, sir, I mean the entire length of the road across the field. * * * The road does become more indistinct as it approaches the hangars. It is very well defined at the southern boundary and at the point where the boy was struck it is even gravel. * * * They were riding or proceeding slowly. * * * I saw the boy look up just a few seconds before the plane struck him and throw himself off his wheel. * * *

"I went out to the field because I read a newspaper story about 'Clem Sohn, the Bat Man,' and that is what took me out there. There was a big crowd out there. I did not make any definite attempt to estimate, but I would say perhaps 3000. * * *

"It is my impression that the plane carrying the man who made the jump was in the air when the boy was killed. * * * "

Descriptions of the accident by other witnesses were similar to the one already quoted, and their testimony referred to the roadway on which the plaintiff's son was killed as apparently having been "traversed frequently," and as having "tracks where machines run."

Harold Molz, eleven years of age, who was the companion of the plaintiff's twelve year old son at the time of the accident, testified:

"I was the boy who was with Harry Birckhead when he was hit by the airplane. Earlier that afternoon, after I ate my lunch, I went around to the lot where we play baseball and we had a game of baseball. Harry Birckhead was playing baseball also, and then we saw this airplane doing some sky writing, and it said something about 'Chevrolet welcomes you' or something like that, and then I said I would not mind going over there. He said, 'Well, I can go.' * * * Then we went up to the field, crossed

Clark's Lane and went in the field. We got up there and looked around to see if any planes were getting ready to take off, and we didn't see none—we didn't see any getting ready to fly around, and then we got on our bikes and crossed.

"Q. How did you get into the airport? A. You see there is an entrance on Clark's Lane and we went through that, right through, and didn't get off our bicycles.

"Q. Rode right on through that entrance? And when you got into that entrance were there any automobiles around there? A. Yes, sir, about six or eight, and people standing around looking at the affair.

"Q. Well, was there any sign up there or something telling you not to enter that way? A. No, sir.

"Q. Was there any police or anybody to stop you from going in there? A. No sir, nobody.

"Q. Nobody said anything to you to the contrary at all? A. No, sir. We got off our bikes and we looked around and then he got on his bike and we crossed the field, and I got off mine and started to walk awhile, and the airplane came and I hollered to him and he jumped off his bike and the airplane hit him. * * *

"I had known Harry Birckhead a long time. He was a year or two older than I. I used to call him 'Bricky.' * * *

"When I first got into the field I got off my bicycle and looked to see if any airplanes were coming down or taking off, and Bricky did that too. * * *

"(The Court) I would like to know when you had first seen that airplane. Now I don't mean when it was about to come swooping down, but had you seen it at any time before? A. No sir. I was riding my bicycle when I first saw it, and I hollered to him and then I got off my bike and kept hollering. * * *

"Q. Did he answer you at all when you called to him? A. He turned his head and saw the ship, and then he jumped. I was riding behind him, about twenty-five or thirty feet. * * *

"Q. When you and Bricky were riding up and came through the entrance and started across the field, did you follow any road? A. Yes sir, we followed the—like tracks, tracks like two wheels of an automobile or truck would make. We rode on our bicycles in those tracks. * * *

"Q. Will you state whether or not you knew about this air circus before seeing the sky writing which said 'Chevrolet bids you welcome'? A. Yes, sir, I did. I saw about it in one of the papers."

Colonel William D. Tipton is president of the Baltimore Flying Service, Inc. He was called as a witness for the plaintiff, and we quote the following from his testimony:

"I arranged with Hochschild, Kohn and Company to permit them to use the airport on Sunday, April 7th, 1935, for a balloon contest. This contest was advertised. * * * On the afternoon of the exhibition visibility was almost perfect * * *. There were two representatives from Hochschild, Kohn and Company at the exhibition * * *. I am familiar with the sort of airplane that was used by Captain Sammon at this time. It was an Alexander Eagle Rock with a Curtiss Challenger engine. The top speed is about 115 miles an hour I would say. I judge the landing speed to be about 45 miles. * * * In approaching a landing field the Department of Commerce regulations require a lefthand circle of the field and a straight approach of 1000 feet to the border of the field in making a landing. * * * The lefthand circle is required so as to put all approaching traffic in one way travel around the field, and also to give the pilot an opportunity to see that the field is clear prior to landing. When he starts his descent he can see the field, I will not say directly ahead, but to his right, because there is a certain part of the fuselage which is attached to the airplane directly ahead of him which obscures his vision directly ahead.

"Q. Well, is there any particular way or approved method of changing that blind spot in front of you? A.

Yes, by what we call fishtailing.. May I use this model? The blind spot is produced by the front part of the fuselage and the pilot can kick the airplane sideways like that (illustrating) to get a view directly ahead of him.

"Q. That is a well known method? A. That's standard practice. The traffic was quite heavy on the field that afternoon. I made a pretty close estimate that there were at least 150 landings and take-offs from two-thirty until the time of this accident during that afternoon.

"Q. Hochschild, Kohn and Company did not make any condition that there shouldn't be any landings or take-offs? A. No sir, but we did suspend all flying at the time their balloon contest was conducted. We stopped all flights to let those youngsters go out on the field and release their balloons, and then they were brought back in behind the fence and the flying went on again. There was an announcer out there during the whole of the afternoon, a Mr. Hildebrand. He used a very powerful sound truck that could be used over the entire area. He was paid by Hochschild, Kohn and Company. He was there until after the accident occurred. * * *"

On cross-examination Colonel Tipton testified:

"Captain Sammon's plane was a biplane. A pilot can, by fishtailing a little bit when coming in, see the ground in front of him where he is going to land.

"Q. If he does that is there anything to prevent him from seeing a boy on a bicycle or anybody in the path where he would land? A. The boy should be visible from a reasonable distance, I should say.

"Q. So there is nothing in there to prevent him from seeing him if he fishtails down into the field as you described? A. No, I should say not. * * *

"Q. Colonel Tipton, when you land a plane customarily do you usually fishtail as you call it? A. No, not always.

"Q. Do I understand you to say that is approved by the Department of Commerce regulations, the fishtailing? A. No, I say that is standard practice for clearing the blind spot. It slightly reduces the speed of a landing. It would not be difficult to pick your speed up again,

because as you cease fishtailing you gradually—not immediately, regain your speed. The engine part of the fuselage makes a blind spot directly ahead, but by leaning from one side to the other you can partially reduce that blind spot and you eliminate it by fishtailing.

"Q. How about the lower wing if you don't fishtail? A. You can't see directly below you, but you can see ahead on a normal gliding angle. You could see two or three thousand feet I should say. You can see completely across our airport, which is four thousand feet.

"Q. How close to you ahead can you see? A. The normal practice is to look at a spot two or three hundred feet ahead of you directly at the field when you are landing, rather than directly down below you, but your field of vision is, of course, taking in items farther ahead, farther to the right and closer to you, but I should say you focus your attention on a point about three hundred feet ahead. * * *

"Q. If the plane were going at forty-five miles an hour and the operator attempts to fishtail it, would there be any danger connected with that? A. If he were right at the stalling speed, which is the minimum speed at which the plane will fly, fishtailing will have a tendency to make an airplane stall, but, anticipating the need of this fishtailing we speak of, the pilot might nose his ship over a little more into a slightly steeper glide and gain some additional speed before he decides he wants to fishtail. * * *

"Q. Do you always feel there is a need for fishtailing as a pilot yourself? A. You never can tell. I don't think you always do, but it certainly is good practice. * * *

"The arrangement I had with Hochschild, Kohn and Company was that I give them the privilege of holding this balloon contest on the flying field at this airport, and they paid fifty dollars for that privilege. I inquired of Hochschild, Kohn and Company whether or not they had an announcer for the balloon contest, and suggested the name of an announcer, a Mr. Hildebrandt, and he

announced for them on that balloon contest. I told Hochschild, Kohn that he charges ten dollars. * * *

"(The Court) What control if any of the flying field or of parts of the flying field did you relinquish to Hochschild, Kohn? A. The complete use of the field during the actual time of the balloon contest, which I judge was about one-half hour, between three-thirty and four. * * *

"I told Mr. Sondheim (Vice President of Hochschild, Kohn and Company) that they could have the use of the flying field during the time necessary to stage this balloon contest, and that I would arrange with the Baltimore County police for a detail of police to police the entire field. We had no specific time when their control began or ended, except that the advertising listed that the affair should go on at 2:30. I believe it was slightly late. * * *

"(The Court) And you negotiated simply and solely for a balloon contest? A. That's right.

"Q. And these negotiations and arrangements that you had with Hochschild, Kohn and Company, can you tell us whether they had anything to do with any other of these air stunts? A. No sir, they had nothing to do with anything else that went on out there. * * *

"I should say I fishtail slightly in practically all landings in an airplane that has a distinct blind spot directly ahead. * * * I would say generally speaking that the greater majority of landings are done with a slight amount of fishtailing.

"Q. And at a licensed airport with a normal runway when a man comes in he should fishtail? A. I think so. There might be an airplane directly ahead of him taking off. * * *

"I know Captain Sammon. He kept his plane at the Curtiss-Wright Airport. He was in no way connected with the Baltimore Flying Service, Inc. I didn't see the accident. His plane was out there in the field making flights that day before the accident. It was returning from one of these flights when the accident occurred.

* * * He was an owner who was flying purely for his own pleasure and had no connection with the so-called air circus."

Hochschild, Kohn & Co., by radio and newspaper publicity, advertised a toy balloon contest and air circus at Curtiss-Wright Airport at 2:30 o'clock on the afternoon of April 7th, 1935. Some of the radio advertisements stated that the details of the contest would be explained at Hochschild, Kohn & Co.'s toy department. A more extended newspaper advertisement was as follows: "Hochschild, Kohn & Company Balloon Contest: A half-hour instruction in actual flying and aeroplane rides over Baltimore will be the prizes in Hochschild, Kohn & Company Buck Rogers' Stratosphere Balloon Contest. The balloons can be purchased only at Hochschild, Kohn & Company. They are to be inflated at home and taken to the Curtiss-Wright Airport Sunday, April 7, at 2:30 P. M. when all balloons will be released at the same time. These balloons will inflate in ten minutes and will stay up as long as five days. When they land, perhaps in another State, the finder will mail the attached card back to the sender. The message cards bearing postmarks from the greatest distance will be eligible for prizes. There will be an air circus, including parachute jumping, and stunt flying, at the Airport on April 7. Free parking facilities at Curtiss-Wright Airport during this event."

Colonel Tipton was called also as a witness for the defendant Captain Sammon, and testified further as to the construction of the airplane which the latter was using when the accident happened, and as to the extent to which his vision would be obstructed in the course of its operation. On cross-examination he said:

"I should say that the blind spot due to the presence of the wing on this particular airplane would be about 500 feet ahead of the airplane. * * * He would be able to see laterally 50 yards on either side of him at a point 500 feet ahead of him when he is crossing the border of the field at we will say 150 feet. * * *

"Q. Suppose he were coming over the edge of the air-

field and were coming to a descent. He could always change his direction and rise again, if he saw anything in his way, couldn't he. A. Yes, sir."

On redirect examination he testified:

"In making a landing an airplane should approach from the side towards which the wind is blowing. He approaches against the wind to get the benefit of the resistance of the wind. Other planes had been landing at almost the same spot where the boy was killed. That happened to be the east-west runway as we call it. It was the runway that was being used, and the landings and take-offs were being made from very near that vicinity."

On recross-examination the testimony of the witness was as follows:

"Q. Is there any device for opening what you call the blind spot by dipping a wing? A. You would not remove the blind spot directly ahead by dipping the wing. It would, however, bring much closer the area otherwise obscured by the lower wing on the side it dips. If you want to have visibility on the right, if you dip the right wing you can see directly between the wings towards the point toward your right. That is a well known device to open up vision."

Captain Sammon testified in chief:

"On the afternoon of April 7th, 1935, I took off around five o'clock, made about a ten minute flight over the city, and returned to the airport. I approached the field from the southeast. I circled over the field to see if everything was clear, and it was clear, and I went off about a mile to the west of the field because the wind was from the east, and headed the ship into the wind and started my glide towards the landing zone. When I circled the field I looked the field over good and it was clear at the time I circled it. As I was banking to head in toward the runway I had a vision of the field. That was the last chance I had to see the field clearly. I looked it over then and it was still all clear. I banked the plane and headed her into the field and started to glide in, and, of course, from that time on the field was partly ob-

scured due to the blind area on the ship due to the motor being in front and the two lower wings also. The pilot sits in the rear cockpit. The cockpit forward is for passengers. I had two passengers. I never saw a thing. I was looking around as much as I could and there was quite a crowd out there that day. It was a busy day and air traffic was especially heavy. Ships were landing and taking off continuously all afternoon on the same runway, but I never saw a thing, and just as I was about to land I felt a jar or bump, and as soon as the ship got on the ground I looked back and saw the boy lying in the field. I cannot see the undercarriage of my ship while I am flying. The wheels and the landing gear is shaded by the lower wing. When I turned my plane to come in from the west to land on the airport field my altitude was about 300 feet. After I turned my plane into the glide I travelled I guess about a mile. It took me probably a minute or a little more to glide in. I should glide in about 50 miles an hour. I made a normal straight glide into the landing zone. That is the requirements of the Department of Commerce."

The testimony in the case has been copiously quoted in order that the unusual problems requiring solution may be discussed in their proper relation to the relevant facts.

The right of the plaintiff to have the case submitted to the jury as against the owner and operator of the airplane is asserted upon two grounds: (1) That the evidence admits of an inference that he failed to use ordinary care to avoid such an accident; and (2) that he is liable under the terms of a statute. The second of those grounds will be first considered:

By chapter 637 of the Acts of 1927 a new article, designated as Article 1A and entitled "Aeronautics," was added to the Code of Public General Laws. Section 5 of the article contains the provision which the plaintiff cites. It is thus expressed: "(Damage on Land.) The owner of every aircraft which is operated over the lands or waters of this State is absolutely liable for injuries to persons or property on the land or water beneath, caused by the

ascent, descent or flight of the aircraft, or the dropping or falling of any object therefrom, whether such owner was negligent or not, unless the injury is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property injured."

The preceding section of article 1A provides as follows: "4. (Lawfulness of Flight.) Flight in aircraft over the lands and waters of this State is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. The landing of an aircraft on the lands or waters of another, without his consent, is unlawful, except in the case of a forced landing. For damages caused by a forced landing, however, the owner or lessee of the aircraft or the aeronaut shall be liable, as provided in Section 5."

When the two sections are considered together, as they should be, it is reasonably clear that the liability which section 5 purports to impose on the owners of aircraft, whether negligent or not, has reference only to injuries to persons or property where the descent of the aircraft would be a trespass upon the rights of the land owner. Both sections refer to flights of aircraft "over lands or waters" of the State. By section 4 the landing of aircraft on lands or waters of another is declared to be unlawful, without his consent, except in the case of a forced landing, for which damages may be recovered as provided by section 5. The terms of the two interrelated sections do not, in our opinion, permit the interpretation that they were intended to apply to the authorized landing of airplanes at an airport. In view of our conclusion as to the scope of the provision cited by the personal appellee, we find it unnecessary to consider the argued question as to its constitutionality and its applicability to a suit, under article 67 of the Code (as amended by Acts 1929, ch. 570, sec. 3), for negligence causing death.

The question as to the airplane owner's liability in this

case is determinable in accordance with common law prin-
ciples affecting responsibility for negligence. *Wilson v.
Colonial Air Transport,* 278 Mass. 420, 180 N. E. 212,
214; *Greunke v. North American Airways Co.,* 201 Wis.
565, 230 N. W. 618; *Shaw v. Carson,* 218 Iowa, 1251,
257 N. W. 194. In the first of the cases just cited the
Supreme Judicial Court of Massachusetts said: "The rules
of law relating to the operation of aircraft, in the absence
of statute, in general are rules relating to negligence and
nuisance, and are not distinguishable from those which
relate to the operation of vehicles, perhaps, more closely
to motor vehicles on land."

In this case we have to consider whether the evidence
admits of a rational inference that the accident to the
plaintiff's son was due to failure to exercise ordinary care
in the operation of the airplane by which he was fatally
injured. It is not the duty of the court to decide whether
or not there was a neglect to observe such care, but we
have simply to determine whether the evidence in the
record is legally sufficient to sustain the plaintiff's con-
tention that the issue should have been submitted to the
jury.

A consideration of obvious importance is that the landing
of Captain Sammon's biplane on the afternoon of April
7th, 1935, was not being attempted under normal condi-
tions. An air circus was in progress at the airport and
was being witnessed by several thousand persons. There
were many children in the crowd. Most of the spectators
were near the hangars on the northern portion of the field,
but some had found convenient points of observation on
its southern margin and there had parked their auto-
mobiles. Leading from that part of the field towards the
hangars was a roadway which appears from the evidence
to have been well defined and available for vehicular traffic.
The road transected the field about four hundred yards
from its western boundary. There is testimony which re-
fers to its southern end as an "entrance" to the field
from that direction. Its course across the field might con-
ceivably suggest to persons entering its southern terminus

to view the air circus that they were at liberty to use it as a means of access to the hangars. If Captain Sammon had observed the bicycle riders as they were proceeding along the road, he could and would have guided his plane to a different landing place. He may have failed to see them because they were concealed from his sight, as he says, by the fuselage and lower wing of his airplane; but those interferences with his vision could have been overcome, according to the testimony, by a slight "fishtailing" movement, described by Colonel Tipton as "standard practice," and by dipping the lower wing. Whether or not the aviator's conduct in gliding so close to the surface of the roadway, under the abnormal conditions then existing, without employing standard and feasible methods for clearing his vision of the ground, may properly be characterized as ordinary care, is a question which, in our judgment, the jury should have been permitted to consider and decide.

There is, moreover, evidence in the record from which it could be inferred that the plaintiff's son and his companion, as they rode towards the place of the accident, were for a time within the range of the aviator's unobstructed vision. They had proceeded slowly along the roadway for a distance of approximately four hundred yards when the accident occurred. It is inferable that they had entered the field when the airplane began its gliding movement from the west, which consumed altogether about one minute. During that movement, covering a mile, there was a considerable portion of the field which neither the fuselage nor the lower wing concealed. It was not until the airplane was only five hundred feet to the west that the roadway came within the blind spot which the lower wing projected. A jury might, in the light of the evidence, consider it improbable that the boys had not entered the field when the gliding movement began, and then, though riding slowly, had reached a point where they were hidden by the fuselage and wing before they were exposed to the aviator's observation. If by due vigilance they could have been observed, an inference

that, under the circumstances, there was a want of due care in the failure to see them, should not be judicially declared to be irrational.

The visit of the plaintiff's son and his comrade to the airport was induced by the special attractions then being provided in pursuance of previous advertisements. It was incumbent upon those in charge of the field to take reasonable precautions for the safety of the visitors thus invited. *Everly v. Baker*, 168 Md. 599, 178 A. 691; *Bethlehem Steel Co. v. Variety Iron & Steel Co.*, 139 Md. 313, 115 A. 59. Police supervision of the entire field was promised, and presumably secured, by Baltimore Flying Service, Inc., for the period of Hochschild, Kohn & Co.'s toy balloon contest. But that part of the program for the afternoon had been concluded an hour before the accident happened, and the testimony tends to prove that no such measure of police protection was then being afforded. The crowd, however, had remained for the air circus. It does not appear that there was then no longer any need to have the field policed. There were no warning signs to deter visitors entering the southern margin of the field from proceeding to the hangars along the roadway which has been described. Whether the omission to provide any such precautions at the time of the accident should be regarded as compatible with due care for the safety of invitees, when the air circus was still in progress, and when ordinary aircraft traffic was being permitted on the field, is a question which we think should have been left to the jury's determination as an issue between the plaintiff and defendant Baltimore Flying Service, Inc.

There is not, in our opinion, a legally sufficient basis in the evidence for imputing liability to Hochschild, Kohn & Co. While that corporation's advertisements had referred to the air circus which followed its toy balloon contest, the proof is clear and undisputed to the effect that it had no connection with the circus, and there is no adequate ground for an inference that it had any authority or control over the operations on the field during the later per-

formance. There was consequently no error in the withdrawal of the case from the jury as to that defendant.

It has been argued on behalf of Baltimore Flying Service, Inc., that it could not reasonably have been required to provide against such a contingency as the failure of an aviator to use available methods to assure himself that the field was clear and safe for his descent. This is said to have been an intervening and independent cause which relieves that corporation of liability. But with several thousand persons on the field in consequence of invitations which Baltimore Flying Service, Inc., sanctioned, we are unable to hold as a matter of law that there was no concurring and contributing want of due care on its part when, in the absence of what might be regarded as reasonably requisite safeguards, it permitted the unrestricted use of the field by other aircraft during the progress of the air circus by which the crowd was then being held and diverted. *State, Use of Schiller, v. Hecht Company*, 165 Md. 415, 169 A. 311.

In regard to the argument that the son of the plaintiff was guilty of contributory negligence, or assumed the risk of injury, in attempting to cross the field at the airport, our conclusion is that the plaintiff's right to have the case submitted to a jury ought not to be denied on either of those grounds. It was testified that her son looked for airplanes before he started along the road over the field, and no hazard was then apparent. To hold conclusively that he was negligent in failing to anticipate and avoid, or that he should be charged with having assumed, such a remote danger as the possibility that an airplane with a wide expanse of field on which to land might descend upon him at some point on the roadway, would subject his conduct to a test of accountability too strict to be just.

> *Judgment affirmed as to the defendant Hochschild, Kohn & Co., Inc., and reversed, and new trial awarded, as to the defendants James S. Sammon and*

*Baltimore Flying Service, Inc.; the costs to be paid by the two last-named defendants.*

BOND, C. J., and PARKE and SLOAN, JJ., dissent from reversal as to James S. Sammon and Baltimore Flying Service, Inc.

OFFUTT and JOHNSON, JJ., dissent from affirmance as to Hochschild, Kohn & Co., Inc.