STATE, USE OF PIPER ET AL. *v.*
HENSON FLYING SERVICE, Inc.

[No. 200, October Term, 1947.]

*Decided July 20, 1948.*

242

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Ellsworth R. Roulette* and *John M. Colton* for the appellant.

*D. Kenneth McLaughlin*, with whom was *Charles F. Wagaman* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a judgment for defendant on a directed verdict in a suit under Lord Campbell's Act, Code 1939, art. 67, §1 et seq., for the use of the widow and child of William LeRoy Piper. Defendant operates an airport at Hagerstown. Its business includes hiring out airplanes by the hour. On November 24, 1946 it hired a plane to Piper. The plane crashed, and that evening, as the result of his injuries, Piper died. The principal question presented is whether the trial court erred in directing a verdict on the grounds (1) that there is no legally sufficient evidence to entitle plaintiff to recover and (2) that it appears from the uncontradicted evidence that Piper was guilty of negligence which directly and proximately contributed to the happening of the accident. On this question the evidence and all rational inferences most favorable to plaintiff must be taken as true, and will be stated as facts. There is, however, practically no conflicting testimony on any material question.

Piper was 32. He had served three years in the Navy, not as a flier, and had the rating of Petty Officer, First

Class. He did some flying before he went into the Navy. While he was stationed at Cleveland he took up flying and on April 7, 1945 obtained a pilot's certificate. In June, 1946 he obtained a U. S. A. Medical Certificate, Student and Co-Pilot license. After returning to Hagerstown he resumed flying at defendant's airport about November, 1946. From June, 1944 until his death he had flown 300 to 400 hours.

On November 24, 1946 Piper, with a student pilot, John Brown, who was 18, went to defendant's airport and rented a plane, a PT23, for an hour at $15 an hour. When they reached the airport they were told the plane was out and would be back at four o'clock. It had been rented at three o'clock, for an hour, by James Keeney. The plane had two gasoline tanks, each of which held 22½ gallons, and a selector valve, with a handle and indicator. By turning the valve to the left or the right, the left or right tank would be connected with the engine. The gauge on each tank and the handle and indicator of the valve were in clear view of the pilot when he was sitting in the cockpit. When Keeney took off, both gauges "showed approximately full." Tanks are never filled to their full capacity; some room is left for expansion. He did not fly quite an hour—about 45 minutes to an hour. When he started, the selector was on the left tank and he left it there. He flew on the left tank and did not switch to the right at anytime. When he landed at the airport and taxied to the hangar he saw Piper and Brown. Piper motioned to him, gave a recognized sign, not to cut the motor off; accordingly he did not cut it off. It was getting close to darkness; Piper climbed up on one wing. When Keeney taxied in, he noticed "the gas gauge was practically empty" and told Piper the tank was practically empty and said "switch it"; Piper said "O.K." During Keeney's flight the plane operated in a good mechanical condition; he had no difficulty with it of any kind. In addition to straight and level flying he did "a little acrobatic; some playing around"; though the airport did not allow acrobatics, he did "a few".

When Piper started over toward the plane he told Brown to get the "release slip" from the office, which Brown did and went back to the plane. Piper was then in the plane. Brown did not then see Keeney. Brown got into the back seat. He did not know anything about double tanks, had never operated a PT23, did not operate this one at any time on this particular occasion, was not qualified to do so, did not then know anything about the gas selector valve, did not know on which tank Piper was flying, was not looking to see whether Piper changed from one tank to another, and did not look at either gauge before they took off. At Brown's seat there was a "wabble pump", an auxiliary pump to be used to force "gas" into the carburetor when the other pump fails or for some other reason you wish to take over the operation with a hand pump in an emergency.

How long they were flying Brown "hasn't any idea". They got about 900 feet up. The motor "started to cut out and miss". Piper called to Brown to start working the wabble pump. The motor "kept on missing, cutting out, run and stop". When he worked the wabble pump it picked up "a couple times". He kept working the pump as hard as he could till he hit the ground. He knew some-thing was wrong but did not know what it was. Before the crash the motor stopped completely toward the end. The crash occurred about 4:15 to 4:30 P.M.

David Crockett, defendant's manager, a witness called by plaintiff, got to the scene of the accident between three-quarters to an hour after it happened. He checked the wreckage of the plane. The left tank was empty, the valve was on the left tank. He found the right tank "fairly full", it was not "in orthodox position", but he estimated to be three-fourths full. There was no evidence of any gas being spilled under the plane or on the ground. There "could have been", but he did not see any. On one tank, normal operation, the plane should go an hour and three-quarters, depending on altitude; on the gas he saw in the tank one hour to an hour and a half at least. He says he bought the plane in July 1946,

never had any difficulty with it in flying it and no difficulty was ever reported to him; the engine never consumed an abnormal amount of gas. Two witnesses for defendant who, besides Keeney, had flown the plane on the day of the accident testified that it operated perfectly mechanically. The Civil Aeronautics regulations [§ 43.23, now § 43.22] required a "100-hour check" on a plane. This plane flew 64 hours after the last 100-hour check in September 1946, when it was thoroughly checked and repaired and an airworthy certificate issued. The Civil Aeronautics regulations required log books to be kept for a plane, showing the flight of the plane and repairs and anything done to the motor or the plane. These logs were not required to be kept after the plane is destroyed. Before March 31, 1947, when claim was first made against defendant on account of this accident, the sheets were torn out of these log books and destroyed, so that the books might be used for another plane. Crockett testified that original records, from which log entries are made and which were produced at the trial, show more than the log book would normally show.

William L. Hammond, of Cleveland, who trained Piper, testified for plaintiff as an expert. He says a plane such as the PT23 normally should give a maximum of four hours on both tanks; it may not be rented for hire unless it is airworthy; the only way to tell whether it is airworthy is "for a mechanic to look at it and find out;" if there was no check or inspection made before it took off, there would be no way to tell whether or not it was airworthy at the time; good practice requires that airplanes contain sufficient gas and oil before they are rented out; acrobatics done would affect the flying if full throttle was used; only a little acrobatics performed would affect the gas supply a little but not materially; if part of the flying was acrobatics, he would use more gas. Assuming the truth of Keeney's testimony and that the left gas tank on which he was flying was almost empty, Hammond would say that was highly abnormal consumption of gas, practically double what it should be. "Q. Would

that condition indicate to you from your experience [anything?] as to the mechanical condition of that motor? A. I would say something was wrong". All pilots are told to take off "on their fullest tank". A pilot before taking off should check the fuel, check his flaps and see that the fuel selector is on a full tank. If Piper took off on the left tank he was violating a Civil Aeronautics regulation. There is no regulation that requires a plane to be given a look-over or inspection before each flight, or a 25-hour inspection.

Richard Henson, defendant's president, testified that "a plane should be in perfect condition before it leaves the port." Defendant's chief flight instructor testified that every morning the planes were taken out of the hangar, checked for gas and oil, the engines started and checked, and the planes taxied; every plane taken out was given a daily inspection and preflighted every morning. On November 24, 1946 there was an inspection or preflight of the plane now in question. On the afternoon of November 24, 1946 two colored boys, employed by defendant as "linemen, gas and oil, check the airplanes", were playing ping-pong when Keeney brought the plane in. They did not notice it come in; they saw it when it was out. Neither of them looked after the plane when it went out.

Plaintiff contends that there is evidence legally sufficient to warrant a jury in finding (a) that Piper's death was caused by some defect in the engine of the airplane, (b) that defendant could have discovered the defect by inspection before Piper took off, and (c) that, therefore, Piper's death was caused by breach of duty of inspection by defendant. Neither these premises nor this conclusion is sound.

With respect to a subject so technical and complicated as the construction and operation of an airplane, there are few facts that are obvious to the uninitiate. One of the few is that, though the consequences are more tragic, the mechanical result of "running out of gas" is the same for an airplane as for an automobile.

In the unfortunate case at bar this is the decisive fact. The plane ran out of gas because Piper did not either (a) turn the valve from the left to the right tank or (b) wait to have the left tank filled before taking off. That the left tank was "practically empty" was as obvious to Piper as it was to Keeney or would have been to the colored boys who would have filled it. Moreover, Keeney told him. That it later became quite empty was as obvious to Piper as it was after the accident.

Plaintiff's contentions are based on speculation unsupported by, and contrary to, the evidence. It is contended that (a) by reason of some unexplained defect, the engine consumed an abnormal amount of gas while Keeney was flying, and when Keeney came in the left tank was quite empty, (b) Piper flew on the right tank (notwithstanding the position of the valve after the accident) and (c) by reason of some other unexplained defect, the engine stopped while the tank in use was three-fourths full. This interpretation of Keeney's statement that the tank was "practically empty", as meaning "quite empty", is unwarranted. The natural interpretation is that (as the event showed) the tank was nearly enough empty to make it unsafe to continue to fly on it. The alleged fact that Piper flew on the right tank is pure speculation. But if all these alleged concrete facts as to the happening of the accident were true, the nature of the alleged engine defects would remain a mystery, and there would be no evidence that they could have been discovered and prevented or remedied by any degree of care, however high, on defendant's part.

"The rules of law relating to the operation of aircraft, in the absence of statute, in general are rules relating to negligence and nuisance, and are not distinguishable from those which relate to the operation of vehicles, perhaps, more closely to motor vehicles on land." *Wilson v. Colonial Air Transport,* 278 Mass. 420, 180 N. E. 212, 214, 83 A. L. R. 329, quoted in *State to use of Brickhead v. Sammon,* 171 Md. 178, 193, 189 A. 265. "The principle of *res ipsa loquitur* only applies where the direct cause of

the accident and so much of the surrounding circumstances as were essential to its occurrence were within the sole control of the defendants or of their servants." Id., 278 Mass. 425, 180 N. E. 214. This statement, applied in a case of a passenger against a private carrier, is more applicable in the instant case, in which the operation of the airplane was within the sole control of plaintiff's decedent. In *Milestone System v. Gasior,* 160 Md. 131, 152 A. 810, it was held that one who lets for hire an automobile, knowing of a defect therein or ignorant of such a defect by reason of negligent failure to examine the automobile, is liable for an injury caused by the defect. Liability was established, not by any presumption, but by proof of a defect which could have been discovered by the exercise of due care.

We conclude, therefore, that there is no evidence legally sufficient to show that the accident was caused by any negligence of defendant and that plaintiff's uncontradicted evidence shows that it was directly caused or contributed to by Piper's negligence.

Plaintiff also objects to admission, on cross-examination of plaintiff's witness Keeney, of the conversation between Keeney and Piper in which Keeney told Piper the tank was practically empty, and said "switch it," and Piper said "O. K." The general rule (so far as now material) is that a witness may only be cross-examined upon matters upon which he has been examined in chief, but the application of the rule in particular cases must largely be left to the sound judicial discretion of the trial court, and its ruling, in the absence of abuse of discretion, will not be disturbed. *Panitz v. Webb,* 149 Md. 75, 80, 81, 130 A. 913. In the instant case, we think the ruling of the trial court was not only free from abuse of discretion but was within the general rule. Keeney was examined in chief upon practically every circumstance of his flight and return and his surrender of the plane to Piper, except this conversation. The conversation was a part—and a material part—of these circumstances.

*Judgment affirmed, with costs.*