# MATHIS *v.* ATLANTIC AIRCRAFT DISTRIBUTORS, INC.

[No. 163, September Term, 1957.]

*Decided March 31, 1958.*

*Motion for rehearing filed April 22, 1958, denied April 25, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT and HORNEY, JJ., and BOYLAN, J., Chief Judge of the Fifth Judicial Circuit, specially assigned.

*Jesse Spector* for the appellant.

*William B. Somerville,* with whom were *Clater W. Smith* and *Clark, Smith & Prendergast* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

Marvin R. Mathis (Mathis) sued Christopher Eilers, Sr., and Jr., the owners of a Cessna airplane, George C. Ruth (Ruth), the pilot, and Atlantic Aircraft Distributors, Inc., (Atlantic), the lessees of a portion of Harbor Field, an airport located on the southeastern edge of Baltimore City near

the Broening Highway, to recover for injuries sustained by him when he was struck by the rotating propeller of the airplane as it was "taxiing" on a paved apron area at the airport. When the case was tried below, the trial court entered a directed verdict in favor of the owners of the airplane, and the jury found a verdict for Mathis against the pilot and Atlantic. On separate motions for judgments n.o.v., the court overruled the motion of the pilot, but granted the motion of Atlantic. Mathis appealed.

Harbor Field is owned by the City of Baltimore, but the airplane hangars and most of the other facilities are leased by the city to various lessees who operate and use the hangars and other facilities. Atlantic occupied and operated several hangars, including Hangar No. 5, and the paved apron areas in front of and alongside the hangars which were used for parking or "tying-down" of airplanes. The paved apron area contiguous to Hangar No. 5 extended 160 feet in a southerly direction in front of the hangar, and was 330 feet wide, overlapping the width of the hangar on both ends. Along the westerly side of the apron, about 85 feet from the hangar, there was a gas-pit, a stationary facility for dispensing gasoline. Atlantic's business consisted of "everything pertaining to airplanes": storage, maintenance, sales of airplanes and parts, rentals of airplanes, and sales of gasoline and oil.

On a clear Saturday afternoon in September of 1953, Mathis, who was a licensed pilot, an aviation enthusiast, a member of the Civil Air Patrol, and a regular visitor at Harbor Field, drove his car to the field so that he might take a ride either in the plane of a friend or in a rented plane. He parked his car in a parking area on the east side of Hangar No. 5, and walked through a gate and onto the paved apron area in front of the hangar. Here he turned and proceeded in a westerly direction in front of the hangar, walking between the Cessna airplane and the hangar. The plane, facing in a westerly direction, was parked just outside the eastern end of the open hangar door. One of the owners of the Cessna had given permission to Ruth to use it on the day in question. Ruth and his sons had gone to Hangar No. 5 and moved the plane to the outside where they were inspecting

it. As Mathis rounded the corner of the hangar and passed the plane, he touched the wing tip as a friendly gesture, which was promptly acknowledged by Ruth. Mathis then turned to his left and walked across the apron area in a southerly direction toward a row of about four to six airplanes that were parked approximately 100 feet south of Hangar No. 5. He talked for a few minutes with friends, and then walked in a westerly direction toward the edge of the gas-pit, intending eventually to go to a snack bar in Hangar No. 1, also leased by Atlantic. At this moment, Mathis saw Court R. Henkel (Henkel), who was standing beside a gas truck parked at the southwest corner of Hangar No. 5, about five to eight feet in front of the hangar. Henkel and Mathis walked toward each other and met on the paved apron area midway between the gas-pit and gas truck. With Mathis facing in a westerly direction toward Hangar No. 1, the two men conversed for a few minutes when Mathis was suddenly struck on his buttock and left elbow from the rear by the rotating propeller of the Cessna piloted by Ruth.

Mathis testified that he had no idea whether Ruth was returning from a flight or was preparing to fly. When he saw Henkel and went to meet him, he was about 200 feet from the place where he first saw the Cessna. He was not sure that the motor was not running, but he was certain that the plane was not moving. Henkel corroborated the fact that the Cessna was not moving when he went to meet Mathis. Neither Mathis nor Henkel heard the plane as it approached because there was a great deal of noise in the area at the time.

Because all the other exits from Hangar No. 5 were blocked, Ruth attempted to maneuver between the gas-pit and the gas truck. The width of this contemplated exit was 58 feet, and the wing span of the Cessna was 34 feet, leaving 12 feet on each side of the plane if it remained in the center of the exit. The Cessna is a peculiar type of aircraft. When it moves on land, the tail section rides on the ground, causing the nose to be thrust upwards to such an extent that the pilot cannot see the ground area immediately in front of the plane. To circumvent the effects of the "blind-spot" it is customary for the pilot to "zig-zag"—or, in aviation parlance,

make "S-turns"—when the plane is taxiing forward in order to get a full view of any person or object that may be in his path. This is accomplished by applying the brake first to one wheel and then to the other which causes the plane to be propelled forward in a zig-zag manner, and enables the pilot to see the area immediately before him first from one window and then the other. As a safety measure, the pilot continues, or should continue, to zig-zag during his entire forward movement on the ground, thus eliminating the blind-spot.

Ruth, having received clearance from the radio tower to taxi to the runway from which he would take off to begin his flight, made the appropriate "S-turns" until he approached the 58 foot exit between the gas-pit and the gas truck. At this point he decided he did not have enough room to continue his zig-zag course. He took a final glance to see if there were anything or anybody in the exit. Seeing neither, he proceeded forward in a straight course at the rate of three miles per hour. Less than a minute after his last look at the area, he struck Mathis.

An inspector for the Civil Aeronautics Administration, who investigated the accident, testified that the normal or standard procedure to avoid the blind spot when taxiing with a Cessna was to make "S-turns" to clear one's vision forward or else "have someone guide you in and out of a tight place". But Ruth did not have anyone guide him in and out of the 58 foot exit while he taxied through it. He believed it would be next to impossible to find anyone to direct him, and he made no attempt to do so.

Much of the testimony concerned the question of whether the position of the parked gas truck was normal. Mathis contends that Atlantic permitted the apron area to become overcrowded when the gas truck was parked in front of Hangar No. 5. He had seen the truck parked there only once or twice before. Usually, he testified, it was parked either behind Hangar No. 5 or near Hangar No. 1. Also, he had never seen anyone taxi through the area when the truck was parked in front of Hangar No. 5. On the other hand, both Henkel and William J. Guderjohn, Jr., (Guder-

john), a regular employee of Atlantic, testified that it was not unusual for the gas truck to be parked where it was, and that pilots often taxied airplanes between the truck and the pit.

There was also an attempt to show that Guderjohn, the only employee of Atlantic who was present at the time of the accident, should have warned Mathis of the danger of standing between the pit and the parked truck. Guderjohn, who was working in the gas-pit, saw Mathis walk out to meet Henkel. He did not think it was unusual for men to converse on that part of the apron area, even though he had often seen airplanes taxi through the area. His attention was diverted away from the two men when a plane pulled up to the gas-pit for service. He never saw the Cessna piloted by Ruth in motion.

Two questions are raised by the appeal: (i) was there any evidence of primary negligence on the part of Atlantic?; and (ii) was Mathis guilty of contributory negligence as a matter of law? Necessarily, the answer to the first question depends on whether Mathis was an invitee or a licensee. We shall assume, without deciding, that he was an invitee, and that the care required of a proprietor to an invitee will be the standard with which to measure the existence or absence of primary negligence on the part of Atlantic.

The real question is whether Atlantic was obliged to anticipate the negligence of the pilot in failing to zig-zag or to make "S-turns". Courts have generally expressed this result in terms of "intervening cause" or "foreseeability". *Prosser, Torts* (2d ed. 1955), Sec. 49. There are literally thousands of cases on this point of law. The most that we can do is point out some of the specific trends and elements which influenced the decisions.

In *Prosser, Torts,* Sec. 78, with regard to the duty of a proprietor to an invitee, it is stated:

> "[He] must exercise the power of control or expulsion which his occupation of the premises gives him over the conduct of a third person who may be present, to prevent injury to the visitor * * *. He

must act as a reasonable man to avoid harm from the negligence of * * * other persons who have entered * * *. [But] * * * he is required to take action only when he has reason to believe, from what he has observed or from past experience, that the conduct of the other will be dangerous to the visitor * * *."

In the case now before us there is no evidence that Atlantic had ever been warned or had any knowledge that a dangerous condition existed in its part of the airport. Nor had it ever experienced a pilot taxiing a Cessna between the pit and truck without zig-zagging. However, as Prosser points out, where a proprietor has reason to suspect from past experience that a third party is likely to be negligent, there will be liability. Thus, when a crowd of people have been induced to gather on his premises, the pushing and jostling and shoving of the crowd are reasonably to be anticipated, and the proprietor would be liable for any injuries resulting from the foreseeable acts of the crowd. *Dilley v. Baltimore Transit Co.,* 183 Md. 557, 39 A. 2d 469 (1944). See *Taylor v. Pennsylvania Co.,* 50 F. 755 (C. C. N. D. Ohio 1892), in which the defendant had failed to provide adequate protection against the surging of a crowd at an excursion, and *Schwartzman v. Lloyd,* 82 F. 2d 822 (D. C. Cir. 1936), in which a crowd at an advertised sale pushed plaintiff against a window. This theory also explains the five-to-three decision in *State, Use of Birckhead v. Sammon,* 171 Md. 178, 189 A. 265 (1936), relied on so heavily by Mathis, in which a boy was killed by an airplane making a landing at an airport which he was crossing on a bicycle along a roadway over the landing field. We held that the liability of the airport was a question for the jury to decide because "* * * with several thousand persons on the field in consequence of invitations which * * * [the airport] sanctioned, we are unable to hold as a matter of law that there was no concurring and contributing want of due care on its part when, in the absence of what might be regarded as reasonably requisite safeguards, it permitted the unrestricted use of the field by other air-

craft during the progress of the air circus by which the crowd was then being held and diverted." In other words, the *Sammon* case is but another illustration of a case where a proprietor, having invited a large crowd of people to his premises, is generally held to a stricter standard of care— a standard which generally includes as one of its elements the fact that the defendant should have foreseen that a third party might, because of the circumstances, injure one of the invitees.[1] But in the case at bar there was no unusual crowd at the airport. It was busy, but it was only a normal Saturday afternoon.

There is also the case of *Eyerly v. Baker,* 168 Md. 599, 178 A. 691 (1935), on which Mathis has relied. In that case a patron who was leaving a store was struck by one of the fins of a revolving door which had been put in motion

---

1. For other cases of liability illustrating the foreseeability rule, in which, in addition to an intervening cause, there was also some knowledge or foreboding of unsafe conditions and the dangerous propensities of third parties, see: *In re Sabbatino & Co.,* 150 F. 2d 101 (2d Cir. 1945); *Meyonberg v. Pennsylvania R. R.,* 165 F. 2d 50 (3d Cir. 1947); *Gartner v. Lombard Bros.,* 197 F. 2d 53 (3d Cir. 1952); *Conradt v. Clauve,* 93 Ind. 476 (1883); *Exton v. Central R. R.,* 62 N. J. L. 7, 42 A. 486 (1898); *Mastad v. Swedish Brethren,* 83 Minn. 40, 85 N. W. 913 (1901); *Indianapolis Street Ry. v. Dawson,* 31 Ind. App. 605, 68 N. E. 909 (1903); *Cousineau v. Muskegon Tr. & L. Co.,* 145 Mich. 314, 108 N. W. 720 (1906); *Blakeley v. White Star Line,* 154 Mich. 635, 118 N. W. 482 (1908); *Moone v. Smith,* 6 Ga. App. 649, 65 S. E. 712 (1909); *Greenley v. Miller's, Inc.,* 111 Conn. 584, 150 A. 500 (1930); *Mollencop v. City of Salem,* 139 Ore. 137, 8 P. 2d 783 (1932); *Pignet v. City of Santa Monica,* 29 Cal. App. 2d 286, 84 P. 2d 166 (1938); *Boardman v. Ottinger,* 161 Ore. 202, 88 P. 2d 967 (1939); *Strong v. Chronicle Publishing Co.,* 34 Cal. App. 2d 335, 93 P. 2d 649 (1939); *Swope v. Farrar,* 66 Ga. App. 52, 17 S. E. 2d 92 (1941); *Fortier v. Hibernian Bldg. Assoc.,* 315 Mass. 446, 53 N. E. 2d 110 (1944); *Hughes v. St. Louis Baseball Club* (Mo. App. 1949); 218 S. W. 2d 632; *Blackman v. Rowe,* 96 N. H. 207, 72 A. 2d 460 (1950). See also Annotation, 106 A. L. R. 1003 (1937), and Annotation, 20 A. L. R. 2d 8 (1951). Cf. *Read v. New York City Airport,* 145 Misc. 294, 259 N. Y. S. 245 (1932), and *Davies v. Oshkosh Airport, Inc.,* 214 Wis. 236, 252 N. W. 602 (1934), in which there was no liability on the airports because the plaintiffs were pilots who were negligent.

by a person entering the store. The declaration alleged two theories for recovery. One of them was that the door was defective and unsafe. The store was on a public square and was extensively patronized by the public. We held that the defendant should have known that the door was defective, and should have anticipated that an accident might occur if persons going in opposite directions used it at the same time not knowing of the defect.

In cases where there is no indication that the third party is likely to cause harm, there will be no liability. In *Noonan v. Sheridan,* 230 Ky. 162, 18 S. W. 2d 976 (1929), a storekeeper was not liable to a customer for injuries sustained by the fall of a roll of linoleum upset by boys who were playing around the store. In *Fenasci v. S. H. Kress & Co.,* 17 La. App. 170, 134 So. 779 (1931), a merchant was not liable to a customer whom some member of a crowd of *usual* size pushed through a slightly cracked plate glass window. Even though the company may have been negligent in not repairing the cracked glass, the condition of the glass was not the cause of the accident—the cause was the pushing, which was not foreseeable in a crowd of normal size. In *Barnes v. J. C. Penney Co.,* 190 Wash. 633, 70 P. 2d 311 (1937), a customer sued the store for injuries when a child collided with her in an aisle while the child was riding a tricycle which had been exhibited for sale. It was held that there was no evidence of negligence on the part of the defendant, and it was not bound to anticipate the negligence of the child. In *Hughes v. Coniglio,* 147 Neb. 829, 25 N. W. 2d 405 (1946), a patron of a restaurant was stabbed as a result of a sudden fight between two other patrons. A directed verdict was entered in favor of the restaurant keeper on the suit of the injured patron. There was no evidence that the restaurant was normally disorderly or that the keeper knew of the dangerous propensities of the disorderly persons.

We hold that Atlantic was not obliged to anticipate the negligence of Ruth. And since there is no other evidence of primary negligence on the part of Atlantic, the judgment n.o.v. should be affirmed.

Obviously, it is not necessary for us to consider the re-

maining question concerning the presence or absence of contributory negligence on the part of Mathis.

*Judgment affirmed, the appellant to pay the costs.*