## TAYLOR *v.* PENNSYLVANIA CO.

*(Circuit Court, N. D. Ohio, E. D.* May 9, 1892.)

### No. 4,767.

**1. CARRIERS—INJURIES TO PASSENGERS—NEW TRIAL—WEIGHT OF EVIDENCE.**
In an action against a railroad company for injuries to a passenger due to the pressure of a crowd passing through its gates to a train, plaintiff and another witness testified that but one of the five gates was open. Several witnesses for defendant testified that all the gates were open, but they had other duties to perform at the train which would interfere with their observation on this point, and the gate keepers and policemen stationed at the other four gates were not examined. *Held*, that a finding by the jury that but one gate was open would not be disturbed on motion for new trial.

**2. SAME—INJURIES AT STATIONS—DEGREE OF CARE.**
A carrier is held to the highest degree of care as to the condition of its engines, cars, bridges, and other appliances, because negligence as to them involves extreme peril to passengers; therefore, as a passenger's detention at a depot, or his exit to the train, is not attended with the hazards pertaining to the journey on the cars, the degree of care is justly lessened to the extent that at such a time and at such a place the carrier is bound to exercise only a reasonable degree of care for the protection of its passengers.

**3. SAME—CROWDING AT STATIONS—NEGLIGENCE.**
Where a railroad company, by means of advertisements and reduced rates, induces an unusual crowd to collect at its stations, it is bound to use such means as are reasonably necessary to prevent injury to individuals from the conduct or pressure of the crowd in passing to and from its trains.

**4. SAME—DAMAGES.**
Where, on account of the failure of the railroad company to use such sufficient means of prevention, a passenger is jammed against a railing, and sustains injuries to her spine, which result in paralysis of her legs, and disability for life, a verdict for $5,500 damages is not excessive.

At Law. Action by Sarah E. Taylor against the Pennsylvania Company to recover damages for personal injuries. A verdict was rendered for $5,500, and defendant now moves for a new trial. Denied.

*John M. Stull, F. E. Hutchins,* and *Robert B. Murray,* for plaintiff.
*J. R. Carey* and *W. C. Boyle,* for defendant.

RICKS, District Judge. The plaintiff instituted this suit to recover

damages for a serious injury sustained by her in the Union Depot in Pittsburgh, while she was about to pass out of one of the exit gates through which passengers were required to go to reach the cars. The depot was under the control of the defendant company, and the plaintiff, when injured, was a passenger going to the train which was operated by the defendant, and destined for Niles, Ohio, where she resided. She had purchased an excursion ticket on that day good for one trip from Niles to Pittsburgh and return, and with a very large number of people had visited the latter city on the occasion of the Allegheny Bicentennial Celebration. The defendant company, and other railroads centering in Pittsburgh, had extensively advertised this celebration, and each of them had industriously solicited people to attend. It continued for three days, and the testimony shows that during each of these days a greater number of passengers had been received and discharged from the Union Depot than ever before. The plaintiff was one of this unprecedented crowd. She had left Niles in the morning, transacted her business in Pittsburgh, and returned to the depot about 4 P. M., and there awaited the proper opportunity to pass from the depot to the corridor and exit gates to her train. While so waiting in the depot reception room she heard some person announce the train for Youngstown, when she proceeded to the large door leading from the vestibule to the corridor, and, having shown her ticket to some officer having a badge upon his coat, he passed her out into the vestibule, which was then nearly full of people. She took her place as one of the passengers waiting for the gates to open so that she could proceed to her train. The crowd increased in numbers rapidly, and soon was so closely packed behind and around her as to make it impossible for her to retreat or to move in any direction. She described the jam as so dense that she almost suffocated, and said she was from 10 to 15 minutes in passing from the reception room to the gate. As soon as it opened, the crowd began to move, and she moved with it, and, when she reached the iron railing constructed to turn people to the narrow exit of the gateway, she was, by a sudden surging of the throng, forced and jammed against the railing, and so injured in her spine as to paralyze her lower limbs, and permanently disable her. The case was submitted to a jury, and a verdict returned for the plaintiff, assessing her damages in the sum of $5,500. The defendant has filed its motion to set aside this verdict, and for a new trial.

That the accident occurred substantially as above described is clearly established by the evidence. The two important issues of fact submitted to the jury were: *First*, did the defendant exercise ordinary care in providing a suitable force of officers and employes to properly control and direct the movement of the unprecedented throng which it was advised would crowd through its depot rooms, vestibule, corridors, and gates to reach its trains? and, *second*, did the defendant, regardless of the unusual crowd to be cared for and controlled, undertake to force it through one exit gate to the trains, and thereby cause unnecessary jamming and jostling and violence, and, without fault on the plaintiff's part, force her against the railing, and injure her, as already stated?

The defendant had so constructed its depot that from the spacious corridor, in which this large crowd congregated, five exit gates were provided through which passengers could go to their different trains. The plaintiff and one other witness testified that but one gate was open at the time the accident occurred, and that all the vast crowd was forced through that single gate. Four witnesses for the defendant testified that all five of the gates were open. The only gate keeper whose testimony was taken was the one stationed at the center gate, about which there was no dispute. The other gate keepers, and policemen stationed with them, at the other four gates, were not examined; and it was argued with some force to the jury that their absence was suspicious, and that the witnesses who testified that those four gates were also open had other important duties to perform, and did not observe the gates closely enough to know whether in fact they were open or not at the time of this accident. There was no special finding as to these facts, and I am therefore not advised as to what the conclusion of the jury was as to this issue. It may have been in favor of defendant's contention, and yet the jury may have concluded that upon the other issue, as to the exercise of ordinary care to provide plaintiff a safe exit, the defendant was negligent in not providing a sufficient force to control the crowd. But assuming that the jury found that the gates were not all open at the time of the accident, and that thereby the results before stated followed, such finding is not so clearly against the weight of evidence as to justify me in disturbing it.

The only remaining question, therefore, is, did the defendant exercise ordinary care in providing a suitable force to properly control and direct the movements of the unprecedented crowd then in its custody? The evidence offered by the defendant was that it made application to the chief of police of Pittsburgh for an extra force of patrolmen, and got all it wanted, and that at the time of the accident it had from 20 to 40 policemen, and, with its own employes, had about 100 men in and about the depot to direct and control the crowd in its approach to the depot, while in the depot, and while going to the trains. Upon the subject of the defendant's duty to care for this crowd, the jury were given the following instructions:

"The plaintiff was injured within the depot inclosures of the defendant, and while she was making her way to her train, as one of a very large crowd of passengers. The first important question to determine is, what was the kind and degree of care and protection which the defendant owed to her under the circumstances shown in evidence and at the time of the injury? A passenger while in actual progress on his journey is necessarily exposed to innumerable hazards; is wholly under the care of the carrier; and in view of these dangers, which he can in no respect control, the law imposes upon such carrier the greatest possible vigilance as to the passenger's safety, and holds it responsible for the slightest negligence. This degree of care is fixed not solely because of the relation of carrier and passenger; it is measured by the consequences which may follow the want of care. A carrier is held to this highest degree of care as to the condition of its engines, cars, roadway, bridges, and other appliances, because negligence as to any of them involves extreme peril to passengers, against which they cannot protect themselves. But a rule properly ceases with the reason for it. Therefore, as a passenger's

detention at a station, or his exit to his train, is not attended with the hazards pertaining to the journey on the cars, running at a rapid rate of speed, the degree of care above defined is justly lessened to the extent that in such a place and at such a time the carrier is bound to exercise only a reasonable degree of care for the protection of its passengers. This reasonable and ordinary care depends largely upon the circumstances of each particular case, and is such care as a person of reasonable and ordinary prudence and skill would usually exercise under the same or similar circumstances. Now, apply this rule to this case. The defendant was bound to use such reasonable care, as above indicated, in providing for the safety and protection of its passengers while in its inclosures, and while being conducted to its trains, with due regard to the numbers and character of those on its premises, and with due reference to the risks and dangers to which they were exposed. It was bound to provide a suitable number from its own officers and employes, or from the city police furnished, to assist it in properly controlling said crowd, and protecting men, women, and children in it from violence because of the unruly character or boisterous conduct of any members thereof. But it was not bound to do this to the extent of furnishing a guard of policemen for every passenger, or for every small group of passengers, to protect them from physical injury because of the violence of some of their own number. It was only bound to furnish such suitable number of officers and guards as would insure order, and preserve the peace, and keep the crowd in proper control, so as to direct their movements towards the train. Whether such suitable number of officers and guards was furnished in this case is for you, gentlemen of the jury, to determine from the circumstances as they existed at and about the time of the accident. What was the temper and character of the crowd? Was it boisterous and unruly, composed of drunken or excited men, bent on violence and disorder, or was it a good-natured, orderly crowd, willing to be controlled and directed in its movements? The witnesses for the plaintiff characterize the crowd as orderly and jolly. If this was its spirit and disposition, was there a sufficient number of guards and officers to direct and control it? You have heard the evidence as to the number of these employes of the defendant, of the extra force on duty, and of the detail of city police, as to how they were stationed, what duties were assigned to each, and how they discharged those duties. The defendant was as much obligated to protect passengers from pickpockets and roughs as from violence from the sudden movements of their passengers. If you think the special and extra precautions taken by defendant were proper and sufficient to control and direct that crowd collectively, and to insure to them as a body that kind of care which I have defined, then the defendant would not be liable for an injury inflicted upon the plaintiff by a sudden and unexpected jam or surging of some of the passengers about the plaintiff, who were not within the immediate control or reach of defendant's employes or the police, so that they could have anticipated it and guarded against it. As I have stated, the defendant could not be held to that degree of diligence that called for a guard for every passenger. It was not bound to provide a policeman for each person, to protect and defend him or her from violence of fellow passengers. But it was bound to furnish a suitable number of its own officers or police to properly control, as a body, such a crowd of passengers to the extent already stated. If you find it did this, then it discharged its duty to the plaintiff, and cannot be held liable for this injury."

These instructions correctly state the law as applicable to the case. The degree of care to which the defendant was held in its relation and duty to the plaintiff at the time of the accident was just. Under these instructions, the jury must have found that the defendant did not use such ordinary care in its precautions and preparations to control that crowd

as the emergency and circumstances demanded. In reaching this conclusion, they doubtless took into consideration the fact that the crowd was very much greater in numbers than the defendant was ever before called upon to control and transport. They were there, however, by defendant's solicitation. It had all the means within its power necessary to keep it advised of the rapid increase in the numbers of passengers coming on every train and from every direction. Its capacities and facilities for handling crowds were well known, and had been theretofore repeatedly tested. The people who started on their journey from every town and city within reach of Pittsburgh could not measure the volume of the crowd they were to meet when they reached that city, and could not, therefore, intelligently calculate the risks they were to assume when they became a part thereof at the depot to which they were all transported. The defendant's passengers were therefore not chargeable with knowledge of the dangers incurred by accepting its invitation and its inducements to visit Pittsburgh on this occasion. They had the right to suppose that the precautions to be taken for their safety and protection would be commensurate with the increased dangers confronting them. Of these increased dangers, the defendant had the first and most trustworthy warning. I am disposed, under these circumstances, to hold it to the full measure of care defined in my charge. The defendant took her place in the open space in close proximity to the exit gates to await her opportunity to go to her train. This space, and the vestibule within the depot, were sufficient to safely and comfortably hold the travelers ordinarily in defendant's care. It may even be conceded that the spaces named were sufficient for extraordinary occasions. But they were so packed and jammed on this day as to make the dangers greater than ever before. The crowd immediately surrounding the gates, waiting to be passed through, was permitted to become too dense for proper control or safe exit. The police and guards, as they were stationed, were unable to keep the crowd back. Whether because they were not stationed at the most suitable places, or because they were not active and energetic enough, is not for me now to determine. The jury found want of ordinary care in some of these respects, and I am not justified in saying such a conclusion is not supported by sufficient evidence. The jury were certainly not moved by passion or prejudice in reaching their conclusion. The amount of the verdict indicates that very conservative influences controlled them in their deliberations. The plaintiff has been a great sufferer, and is totally disabled for life. The damages assessed are, under these conditions, as reasonable as the defendant could expect, and indicate that the jurors were not governed by excitement or undue sympathy.

The result may have a wholesome effect. If railroads make prodigious efforts, by offering low rates, and by extended and captivating advertisements, to secure a greater number of passengers to travel over their lines than they can safely and reasonably care for at their terminal points, and accidents follow, they must answer for the risks thus assumed. The traveling public may be justly subject to criticism for going in such

vast numbers, and voluntarily assuming the extra hazards thereby incurred, but the railroad companies are nevertheless bound to take precautions commensurate to the risks they have imposed on the unprecedented crowds thus invited. What would constitute ordinary care in precautions taken for a crowd of 5,000 people might not be ordinary care in case the crowd numbered 10,000. The traveler, as one of 10,-000 passengers, is entitled to the same degree of care that is due to him as one of 5,000. If the carrier which has solicited the 10,000 passengers to travel over its road cannot give to them this proper measure of care, and an injury thereby follows, it is responsible. It cannot invite and undertake to transport more passengers than its capacity justifies, and then excuse itself by claiming an unprecedented crowd, and that ordinary care as to the passengers in its depot was used. For these reasons I am not disposed to disturb the verdict as found by the jury.

The motion will therefore be overruled, and judgment entered.