*Lakisha Sutton-Witherspoon v. S.A.F.E Management, Inc., et al.*,
No. 2589, Sept. Term 2016
Opinion by Leahy, J.

**Motions for Summary Judgment**

A circuit court errs by granting a motion for summary judgment with respect to one of the plaintiffs' two theories of negligence without resolving whether disputes of material fact exist with respect to the plaintiffs' alternative theory.

**Motion for Summary Judgment > Scope of Review**

Although this Court may sometimes resolve appeals on alternative grounds, "an appellate court's review of the grant of a motion for summary judgment is ordinarily limited to the grounds assigned by the trial court." *Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship*, 327 Md. 536, 545 n.5 (1992).

**Negligence > Duty to Business Invitees**

Liability for negligence may lie when "a proprietor has reason to suspect from past experience that a third party is likely to be negligent[.]" *Mathis v. Atlantic Aircraft Distributors*, 216 Md. 262, 265 (1958).

**Negligence > Duty to Business Invitees > Large Crowds**

"When a crowd of people have been induced to gather on his premises, the pushing and jostling and shoving of the crowd are reasonably to be anticipated, and the proprietor would be liable for any injuries resulting from the foreseeable acts of the crowd." *Mathis v. Atlantic Aircraft Distributors*, 216 Md. 262, 268 (1958).

Circuit Court for Baltimore City
Case No. 24-C-16-000613

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2589

September Term, 2016

LAKISHA SUTTON-WITHERSPOON, *et al.*

v.

S.A.F.E. MANAGEMENT, INC., *et al.*

Wright,
Berger,
Leahy,

JJ.

Opinion by Leahy, J.

Filed:  February 26, 2019

\* Chief Judge Matthew J. Fader did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

To celebrate their Super Bowl victory in 2013, the Baltimore Ravens and the City of Baltimore held a victory parade on Tuesday, February 5, 2013. The parade route ran from Baltimore City Hall to M&T Bank Stadium, where fans were invited to a free, unticketed event immediately following the parade (the "Celebration"). The Celebration featured Ravens team members, live entertainment, and concessions and merchandise for sale.

The gates to the stadium opened at 10:00 a.m., and the stadium reached capacity before the parade even began. By 12:30 p.m., the parade was still making its way to the stadium with an "unprecedented public crowd" following behind. The fire marshal ordered the gates to the stadium closed, and the Baltimore City Police Department responded by re-assigning officers from the parade route to the stadium. The gates remained unlocked in case of emergency.

Among the fans who arrived at the stadium following the parade were Ms. Lakisha Sutton-Witherspoon and her eight-year-old son, Nicholas Witherspoon (collectively, "Appellants"). While getting autographs from Ravens players and taking pictures outside of the stadium, Ms. Sutton-Witherspoon heard someone announce that the gate near her was open, even though she had heard an announcement earlier from a helicopter that the stadium was full. She took her son's hand and walked toward the gate. As they walked, a crowd surged toward the gate, knocking over and trampling Ms. Sutton-Witherspoon and her son, injuring them both.

Appellants filed a negligence action in the Circuit Court for Baltimore City against the Baltimore Ravens LP ("Ravens LP"); Maryland Stadium Authority ("MSA"), which

owned the stadium; and S.A.F.E. Management, Inc. ("SAFE"), the Ravens crowd-control and guest-services contractor (collectively, "Appellees"). The circuit court granted summary judgment in favor of each of the Appellees, finding that the facts did not give rise to an inference that they had constructive notice of any dangerous conditions at the stadium. Appellants noted a timely appeal, and present the following questions for our review:

1. "Did the trial court improperly grant summary judgment without consideration of Appellants' contention that the Appellees' negligent security efforts allowed the crowd surge to occur?"

2. "Did the trial court err in finding that appellants failed to make a *prima facie* showing of negligence?"

We conclude that the circuit court, in granting the summary judgments in the underlying case, failed to address Appellants' alternative theory of negligence set out in the complaint. The court did not resolve the allegation that a crowd of the size that attended the stadium event was reasonably foreseeable and could create a risk of the type of harm suffered by Appellants, and that the Appellees failed to undertake reasonable safety precautions to control the crowd they invited to the stadium. Accordingly, we must reverse the court's grants of summary judgment and remand the case.

## BACKGROUND[1]

Ms. Sutton-Witherspoon, her husband, and their three children arrived in Baltimore City sometime between 10:00 and 10:30 a.m. on the day of the parade. After parking their car, they proceeded to the corner of Light and Pratt Streets to await the parade. Once the

---

[1] The following factual background derives from the deposition excerpts and the exhibits that the parties attached to their memoranda in support of and in opposition to their motions for summary judgment.

parade passed, they headed toward the stadium and the parade convoy, walking west on Conway Street, past Oriole Park at Camden Yards. Around the time they walked past the warehouse at Camden Yards, Ms. Sutton-Witherspoon heard a police helicopter overhead announce that the stadium was full. This was the only time she heard an announcement that the stadium was full.

When Ms. Sutton-Witherspoon and her family arrived at the stadium, the floats had stopped and the players were taking pictures and signing autographs. The family got players' autographs and took pictures of Ray Lewis for "more than five minutes." As they did, the crowd grew "[a] little bit" but "[n]ot tremendously." At some point, Ms. Sutton-Witherspoon heard someone say "[t]his gate is open,"[2] referring to the gate near the floats where she and her family stood. Nicholas testified that he could see that the gate was open from where he stood.

Ms. Sutton-Witherspoon and her family began walking toward the gate—which she remembered was either Gate C or D. She recalled that other people were heading toward the gate as well, but it "wasn't a tremendous amount of people." She held Nicholas' hand

---

[2] There is no video footage of Gate C reopening and no deponent testified to observing how the gate opened. Mr. Roy Sommerhof, Ravens LP's Senior Vice President of Stadium Operations, testified at his deposition that no Ravens LP employees were present when Gate C opened, but he believed that someone from SAFE "indicated [] that someone from the outside" may have "pushed" a SAFE employee out of the way through the gate, reached in, pulled the latch, and opened the gate. He further testified that no one from Ravens LP took a statement from any of the SAFE employees working at Gate C, and to his knowledge, neither did any other organization. According to Mr. Joe Parr, SAFE's Director of Operations, after initially confirming that Gate C was closed, he returned later to find it open with "people [] running through the gate." He observed "people up against the gate all the way down the gate[,]" and "lined up all the way along the back fence line." He said there were "a lot of people in the area."

as they walked at a "very leisurely" pace. The gate they planned to enter was open and there were "no turnstiles" or anything, "[i]t was just an opening." Then, when they got under the awning in front of the gate, she "felt Nicholas get snatched out of [her] hand." She "turned around to look, to see where he went," scanning the crowd, observing that there "was a lot of people . . . all of a sudden." "[A] herd of people [] came out of nowhere," she said.

When she looked down, she saw Nicholas on the ground with "people walking over top of him." Nicholas said that he was "pushed forward and knocked down" by the crowd around him as people in the crowd began to run. He explained that, after getting knocked down, "everything went black. Everything was black, and it was a very small space. And the very second after that, I started yelling for my mom. I was very scared."

The crowd knocked down Ms. Sutton-Witherspoon as well. She described what happened next:

> I tried to get up and it was just – people were just walking on top of me. It was just a lot of people. And I just – I couldn't get up. And then people started falling on top of me. And then people were walking on top of the people that were on top of me. I just felt feet and I was screaming and I could just hear Nicholas screaming and it was just a lot of people.

She related that she "was grabbing at people's ankles, hoping someone would look down[,]" but she "eventually ran out of air and couldn't breathe." "I think I passed out[,]" she said, "I just don't remember."

The police dispersed the crowd with pepper spray. Ms. Sutton-Witherspoon's husband found her and helped her up. When she got to her feet she could not put weight on her ankle; her pants, shoes, and socks had been torn off. Her face burned from the

4

pepper spray but she did not see any police officers in the area. She looked back for Nicholas and saw a stranger helping him to his feet. Ms. Sutton-Witherspoon was given a wheelchair. Nicholas sat on her lap, and the two were wheeled through the still-open gates into the stadium, where they received treatment until an ambulance came and took them to the hospital.

## The Stadium

MSA owns the stadium and, by a 30-year lease dated August 15, 1997, grants Ravens LP the exclusive right to use the stadium for NFL games and related events. The lease grants Ravens LP control and authority over decisions about "ticketing, admissions, and gate operation," as well as "the process for admitting attendees" to events at the stadium. Despite earlier discussions with Baltimore City officials, who preferred that the Ravens hold the event between City Hall and the War Memorial Plaza as they did after their Super Bowl win in 2001, Ravens LP decided to host the Celebration at the stadium. Mr. Roy Sommerhof, Ravens LP's Senior Vice President of Stadium Operations, testified that he expressed his agreement with the Baltimore City officials to senior officials within the Ravens organization, but they decided to host the Celebration in the stadium contrary to his advice. The dispute, it seems, hinged at least in part on disparate predictions of crowd size. According to Mr. Sommerhof, Ravens LP had "some real deep discussion[s]" about not having the Celebration at the stadium because there might only be 30,000 attendees and "there wouldn't be enough people to fill" the 70,000-capacity stadium: "there was a real concern among some leadership at the Ravens organization that we would [not] have more than 30 or 35,000 people, given that it was a Tuesday in February – and you

5

never know what the weather is going to be – in the middle of a workday." Personally, Mr. Sommerhof believed the 30,000-35,000 estimates were off and he expected there to be around 70,000 guests. And although a few other members of the organization shared his belief, he "was in the minority."

Ravens LP decided to make the Celebration free of charge and unticketed, but offered concessions and merchandise for sale and made the restrooms available to guests. It issued a press release announcing the Celebration, which would begin at approximately 12:30 p.m. at the stadium. The press release further stated that "fans [we]re encouraged to attend a celebration featuring the team and live entertainment." Fans were permitted entrance to the stadium beginning at 10:00 a.m.

### Crowd Management Preparations

In his deposition, Mr. Sommerhof testified that his crowd management responsibilities were to "work with Maryland Stadium Authority, [SAFE], and others, including the Baltimore City Police Department, to develop plans for crowd management and the safe operation of M&T Stadium for events and M&T Stadium." He testified that he would develop these plans "[u]sually for just about every event" that Ravens LP has. On the day of a normal event, Ravens LP holds a pregame meeting with all its partners (SAFE, the housekeeping and concessions contractors, MSA, the Baltimore Police Department, and the Baltimore City Fire Department) at the stadium, at which point Ravens LP informs SAFE of the posts of police officers during the event.[3] There was no meeting

---

[3] S.A.F.E.'s Director of Operations, Mr. Parr, testified at his deposition, over objection, that he believed a pre-event meeting should have occurred as usual before the

in advance of the parade and Celebration, however. And, of relevance to this appeal, Mr. Sommerhof testified that Ravens LP had no plan in place for what would happen if the stadium reached maximum capacity on the day of the Celebration.

Although there was no meeting, there was a call between SAFE and Ravens LP, during which time the two entities agreed that there would be no need for ticket scanners or bag checks. SAFE, Ravens LP's "crowd control and guest services contractor," provides "event management functions and security functions" for M&T Bank Stadium and the Baltimore Ravens on game days. SAFE's tasks, under the general umbrella of "event management," include "usher[ing], ticket taking and scanning, and security at certain locations throughout the building." Because SAFE would not need the employees who scan tickets and check bags for the Celebration, it reduced its staffing, including supervisors, below the normal game-day level.

On a normal game day, for instance, SAFE would have five supervisors at Gate A, but on the day of the Celebration those five supervisors were not scheduled to work. The supervisors for Gates B, C, and D were not present either and, according to SAFE's Director of Operations, Mr. Joe Parr, any employees who would have been assigned to scan tickets were also absent. Additionally, on normal game days, SAFE erects "bike rack-type installations" at each gate prior to the games to help people form a line while they are entering the stadium. Mr. Sommerhof said it does this "in order to try to keep people in some semblance of order when they're getting to the gate area, so that we can scan their

_____

parade and Celebration.

tickets, provide entry to them, we put them in kind of queue lines." The use of the installations, he explained, is derived from "the requirements through best Practices for Stadium Security." But because there were no tickets to scan, "there was no need for [the installations]."

Mr. Parr testified that SAFE and Ravens LP shared the responsibility for establishing the number of SAFE employees who would work at the various events at the stadium. But, according to Mr. Parr, the responsibility for posting police officers as additional personnel during events rests solely with Ravens LP—not with SAFE.

## Command Center

The Command Center is a room inside the stadium in which about 20-30 people monitor several TVs showing a closed-circuit feed from the security cameras within and outside of the stadium. Each Appellee had at least one agent in the room, in addition to personnel from the police department and the fire marshal's office.[4] Mr. Sommerhof explained that "representatives from just about each one of those entities [were] in that room, and they [we]re monitoring activity in and around the stadium[,]" looking for various issues including "crowd management and safety concerns." The TVs also displayed streaming footage from cameras on helicopters flown by the police department and a local news affiliate, WBAL. Observers in the Command Center could see from the video feeds

---

[4] Mr. Greg Cook, MSA's security manager for the stadium, testified that he was in the Command Center along with personnel from SAFE, Ravens LP, the Baltimore City Police Department, and the Baltimore City Office of the Fire to observe the "unprecedented public crowd" approaching the stadium, and heard that the fire marshal ordered the stadium closed.

8

"that an unprecedented public crowd had breached the parade route and was headed to the stadium, which was nearing maximum capacity[.]"

At some point after witnessing the video feed of the crowd approaching the stadium, the fire marshal informed Ravens LP that the stadium was already at capacity and that it needed to close the gates. Ravens LP responded "immediately" by "set[ting] about with [SAFE]'s help to comply with the request." SAFE closed the gates within five minutes. The gates needed to remain unlocked, however, for the safety of the crowd inside the stadium. Mr. Greg Cook, MSA's security manager for the stadium, testified that, other than the Ravens LP's order to close the gates, the only efforts undertaken by any entity in response to the crowd moving toward the stadium were made by the police, who called for more police assets "anticipating the need for some additional staffing." Around 20 to 30 minutes after the fire marshal ordered the gates closed, the police helicopter above Oriole Park announced that the stadium gates were closed.

After Ravens LP instructed SAFE to close the gates, Mr. Parr went to the concourse to assist his staff, beginning at Gate A. By the time he reached Gate C, it was already closed. Mr. Sommerhof testified that SAFE is responsible for closing the gates, and for crowd management at the gate with the assistance of the Baltimore City Health Department.[5] The areas outside of Gates A and C as well as the sidewalk surrounding the

---

[5] Mr. Sommerhof confirmed that the term "gates" included the "area under the [stadium's] overhang up and until the portion of the recessed gate" at the stadium's entrance. There is some dispute between the Appellees, however, about which entity is responsible for securing the area just outside of the gates. Mr. Parr explained that SAFE is responsible for the gates of the stadium, but claimed that everything outside of the gates is MSA's responsibility. He testified that on the day of the Celebration, SAFE was only

9

stadium were visible on the video surveillance feeds in the Command Center.

## The Parade Reaches the Stadium

According to Mr. Cook, at about 12:30 p.m., those present in the Command Center watched video feeds of the crowd approaching the stadium. The police commander in the Command Center reacted to the "unprecedented public crowd" by re-directing police officers who were escorting the parade to come to the stadium. The parade began to arrive at the stadium, one parade vehicle at a time. The Ravens players dismounted the parade vehicles outside the stadium. Ray Lewis was the last player to arrive, riding in a Humvee. Mr. Cook recalled that it took 90 minutes for the players and their families to disembark from the parade vehicles and to enter the stadium. And once the players were off the floats and other vehicles, they remained outside the stadium to take photos and to sign autographs for the fans congregating outside.

---

responsible for controlling people who were coming into the stadium and ensuring they did so in an orderly fashion. On the other hand, according to MSA, Ravens LP and SAFE "are responsible for monitoring, patrolling, and controlling ingress and egress" in "the area within the cement overhang over Gate C or D" where Appellants' injuries occurred. Mr. Cook explained that, on event days, SAFE, augmented by city police, has control of all the access points to the stadium except for the service-level access ramp, which remains in MSA's control. Regarding the area under the awning at Gate C and the landing at the top of the stairs leading up to the gate—the area where the crowd surge toppled Appellants— Mr. Cook testified that securing the area was SAFE's responsibility and that SAFE had routinely staffed that area during events for the past 11 years. Anything "in close proximity to [the] gate, ten feet, thereabouts or less, [SAFE] and police officers that are assigned to those gates take care of those issues." Mr. Vernon Conway Jr., an employee of MSA, acknowledged that Mr. Cook's testimony conflicted with Mr. Parr's testimony that the area outside of the gates was MSA's responsibility. He disagreed with Mr. Parr's allocation of responsibility.

10

**The Crowd Surges**

Eventually, the crowd that followed the parade to the stadium tried to make its way inside—some people climbed the gates and others went through the unlocked gates. People outside the gates reached in and lifed the latches to open the gates. Initially, SAFE had no personnel assigned to make sure the gates' latches remained in place, but it "did put people there to monitor the latches once [it] discovered people were pulling the latches because it was happening all over the stadium."

After a gate would reopen, a crowd would surge toward it as people outside attempted to gain entry to the stadium. Mr. Parr witnessed the first surge, which occurred at Gate A1. He responded by reporting the surge to the Command Center and directing his staff to "watch the handles" on the other gates. He instructed his staff to let him know if any gates were open "so that we can respond." He explained that SAFE has a "hands-off" policy under which it will not physically grab any guests; instead it will simply attempt to verbally diffuse any incidents. Mr. Parr admitted that he did not direct his staff to communicate to people outside the stadium that the gates were closed, but added that he also did not "prohibit staff" from doing so. He could not recall any specific directive from Ravens LP or MSA to SAFE about how to respond to the crowd surges and gate openings. The stadium did not have a P.A. system outside to allow Ravens LP to communicate to employees or the crowd that the stadium was closed. Mr. Sommerhof testified that, as far as he was aware, Ravens LP did not tell fans outside that the gates were closed. He suggested that doing so was unnecessary: "I think the gates being closed kind of tells you that the gates are closed."

11

Mr. Parr testified that it took "several minutes" for SAFE to close Gate A1 after it was reopened. At some point after the crowd surge at Gate A1,[6] Gate C opened and a crowd surged at that gate as well. No one from SAFE requested further assistance outside of the gates and the surges persisted until additional police officers "actually stood in front of the gates, on the exterior side of the gates."

**The Complaint**

On February 5, 2016, Appellants filed a complaint in the Circuit Court for Baltimore City asserting negligence claims against each of the Appellees. The complaint alleged that Appellees "anticipated a large number of individuals to attend the events taking place inside of M&T Bank Stadium" and at all times "were on notice of the possibility of large crowds gathering at the entry of the facility and were on notice of the corresponding need for security." The separate counts against the individual Appellees consisted of mostly the same allegations: Appellees owed a duty of care to operate the stadium and to undertake security efforts with due care for attendees, including Appellants, and owed business invitees "a duty to use reasonable and ordinary care to maintain the premises in a safe condition, to exercise reasonable care to protect business invitees, and to warn of existing hazards." Based on these duties, Appellants alleged that Appellees should have posted employees "in a manner that would have allowed them to control the large crowd arriving

---

[6] The record does not reveal how much time elapsed between the surge at Gate A1 and the surge at Gate C. Although there were cameras monitoring the entrances, Ravens LP did not preserve the surveillance footage and neither Ravens LP nor SAFE conducted post-incident interviews of the employees or police officers who were present when the gates opened.

12

at and entering the facility." Further, Appellants alleged that Appellees breached the duties of care they owed Appellants

> by, among other things, failing to advise/warn them of dangerous conditions that existed at M&T Bank Stadium; failing to make reasonable and necessary efforts to eliminate known dangerous conditions; providing security in an improper and ineffective manner; failing to have sufficient agents, servants, and/or employee[s] providing security efforts; failing to utilize barricades and/or other crowd control devices; and in other respects not known to [Appellants], but which may become known prior to the time of trial.

Appellants also denied any contributory negligence and claimed injuries as a direct and proximate result of Appellees' alleged negligence.

Ravens LP filed an answer on March 16, 2016, generally denying liability and asserting that the court should dismiss the complaint for failure to state a claim on which relief can be granted. Additionally, Ravens LP asserted affirmative defenses of contributory negligence, assumption of risk, and that the statute of limitations barred Appellants' claim.

**Motions for Summary Judgment**

Ravens LP moved for summary judgment on November 17, 2016. SAFE and MSA filed similar motions on November 18 and December 2, respectively. On December 6, Appellants opposed the motions for summary judgment by the Ravens and SAFE and filed their opposition to MSA's motion on December 19.

The circuit court held a hearing on December 21 to consider the motions for summary judgment. Ravens LP argued, in main part, that Appellants were trespassers who tried entering the stadium more than half an hour after hearing the police helicopter announce that the stadium was closed. Any implied invitation from Ravens LP to

Appellants to enter the stadium was revoked at the time Appellants heard the announcement that the stadium was full. Ravens LP contended that any "innocent mistake" by Appellants as to their status on the property does not change their legal status or the duty that Ravens LP owed them. They urged that it did not matter that Appellants were injured before entering the stadium because they *intended* to enter the stadium when they were injured. Finally, Ravens LP suggested that the crowd approaching the stadium did not put the organization on notice because the size of the crowd did not cause the surges and the crowd did not have "pitchforks and knives" as it approached. Ravens LP concluded, "[o]nce these surges occurred, . . . there was nothing to be done."

SAFE argued the merits of its motion, proceeding on four points: (1) Appellants were trespassers; (2) there's "simply no evidence of negligence by [SAFE]" or any other defendant; (3) there was "no notice to [SAFE] of any dangerous or defective condition on the property" as a plaintiff is required to show when proceeding on a premises-liability theory of negligence; and (4) Appellants were contributorily negligent. The court pressed SAFE on when exactly it was that Appellants became trespassers. SAFE responded, "[i]t was a free event until it was closed and there was no more entry. And once the stadium was closed, people on the property became trespassers."

Additionally, SAFE argued that it could not be liable because, by the time Appellants were injured, "[t]he police had taken control of the situation outside of the stadium[,]" relieving SAFE of any standard of care. SAFE asserted that it was "impossible" that any of the Appellees had even constructive notice of the alleged danger or defective condition because, based on Ms. Sutton-Witherspoon's own deposition

14

testimony, "the surge was sudden and instant." And, even assuming there was notice, SAFE continued, "there was certainly no reasonable time to either cure or warn [Appellants] of the surge that was coming." Finally, SAFE argued that Appellants were contributorily negligent because they knew or should have known that the crowd was unsafe and they nevertheless participated in the crowd.

MSA was third to argue, asserting that it was "in an even superior position for summary judgment" because Ravens LP controls the events along with their independent contractor, SAFE. According to MSA, the facts were undisputed and "it's clear that [MSA] had no role to play in deciding . . . that this would be an open unticketed event. No role in deciding how the gates to the stadium would be staffed, how police would be position[ed], how [SAFE] would be positioned, et cetera, et cetera." And the only thing Appellants could allege to the contrary, MSA argued, was the self-serving deposition testimony of Mr. Parr, who claimed that MSA was responsible for controlling the area beyond the gates where Appellants' injuries occurred. Further, MSA claimed that, although there was notice the crowd was approaching with the parade, there was no notice of danger to Appellees because the crowd was "orderly . . . [and] happy . . . not a rampant dangerous mob that would have given anybody notice[.]" Finally, MSA suggested that it was not on notice of potential crowd surges because, following the Ravens' Super Bowl victory in 2001, Ravens LP did not host their parade at the stadium and there was no stampede at that previous parade.

In opposition, Appellants asserted that two factual discrepancies exist in the record that must be resolved in their favor: (1) there was no conclusive evidence of who opened

15

Gate C or that it was opened unlawfully and (2) other than the police helicopter by Oriole Park, there was no evidence of any announcement at the stadium that the stadium was closed for entry. Next, Appellants contended that Ravens LP extended an open invitation to the stadium, indicating that concessions and merchandise would be available there, meaning Appellants could not be considered trespassers unless Ravens LP retracted that invitation at some point. According to Appellants, the fire marshal's decision that the stadium reached capacity is distinguishable from the Ravens LP or SAFE retracting the open invitation to attend the Celebration—and "[t]here was absolutely no communication" between Ravens LP or SAFE and the Appellants, despite the huge crowd approaching the stadium. Attributing the police helicopter's message to Appellees was "a tremendous leap" and would, "at the very least," require the court to impermissibly draw an inference against Appellants as the non-moving party

Additionally, Appellants argued that Appellees understaffed the Celebration because it was unticketed and provided only a "scaled-down crowd management and security force." In response to a question from the court on standard of care, Appellants suggested that Appellees' past practice for sold-out events, in part, established a standard of care for the Celebration and that Appellees' decisions that day created a hazard. Appellants' counsel stated: "I think that there can be an imputation of negligence based on [the fact] that there was some knowledge of the need for these practices and policies to be followed [at full stadium events], and because they were not [here] there was a breach in the standard of care." According to Appellants, the standard of care required Appellees to act at the point when the fire marshal declared the stadium at capacity and their staffs

16

observed the crowd following the parade in the Command Center video feed. Even after the first crowd surge, Appellees did not act, "[s]o the notion that this crowd surge was wholly unexpected and could not have been anticipated, is not supported by the actual record in this case." Further, Appellants asserted that Appellees' ability to prevent the danger was demonstrated by the fact that the personnel that was eventually posted by the gates is what quelled the crowd surges.

The circuit court took the parties' arguments under advisement. On January 12, 2017, the court entered a memorandum opinion and order granting Appellees' motions for summary judgment. The court correctly rejected the Appellees' contention that Appellants were trespassers and assessed Appellants' claims as business invitees. Then, the Court "conclude[d] that the fatal flaw in [Appellants'] claims against the various [Appellees] is a lack of notice and opportunity to correct the dangerous condition or warn patrons thereof." After quoting from this Court's decision in *Rehn v. Westfield America*, 153 Md. App. 586, 593 (2003), the Court ruled as follows:

> The undisputed facts establish[ed] that Defendants had neither actual nor constructive notice of any dangerous condition, specifically a crowd surge at M&T Bank Stadium. Furthermore, no reasonable inference could be drawn from the undisputed facts that there was actual or constructive notice to Defendants. [Ms.] Sutton-Witherspoon testified at deposition that, while walking toward the stadium there "wasn't a lot of people" but there was a sudden crowd surge. She described the scene as "a herd of people that came out of nowhere." Later in her testimony, [Ms. Sutton-Witherspoon] reiterated that "it happened very fast," "all of a sudden out of nowhere there was just like a surge of people," and "it's like didn't see it coming, didn't hear it, it was just all of a sudden, that it was instant."
> In sum, the Court concludes that Plaintiffs' claims fail due to the Defendants' lack of actual or constructive knowledge of the dangerous condition resulting in injury.

17

Accordingly, the court granted each of the Appellees' motions for summary judgment and entered judgment against Appellants. Appellants noted their timely appeal to this Court on February 9, 2017.

## DISCUSSION

## I.

## Negligence

As they did in their complaint and opposition to summary judgment, Appellants assert two alternative theories of negligence: (1) Appellees failed to anticipate the reasonably foreseeable, large crowd they invited to the stadium and then failed to take reasonable and ordinary safety precautions necessary to control the large crowd that arrived and entered the stadium, thereby creating a hazardous condition; and, (2) once the "unprecedented public crowd" arrived, Appellees failed to warn of an existing danger or to reasonably endeavor to eliminate a known danger prior to the crowd surge at Gate C.

Maryland Rule 2-501(f) provides that a circuit court shall enter summary judgment in favor of a moving party "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." On appeal of a grant of summary judgment, we review "whether a dispute of material fact exists" and "whether the [circuit] court was legally correct." *Deboy v. City of Crisfield*, 167 Md. App. 548, 554 (2006) (citations omitted). In doing so, we must view "[t]he facts and inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *Id.* (citations omitted).

The circuit court—without distinguishing between Appellants' two theories of

18

negligence—ruled simply that Appellants' second theory of negligence failed because "[t]he undisputed facts establish that [Appellees] had neither actual nor constructive notice of any dangerous condition, specifically a crowd surge at M&T Bank Stadium." This ruling did not address whether Appellees should have reasonably foreseen a crowd of the size that attended the parade and that they invited to the Celebration; nor did it address whether their staffing levels and safety precautions were appropriate given the unticketed and highly publicized nature of the event. Although this Court may sometimes resolve appeals on alternative grounds, "an appellate court's review of the grant of a motion for summary judgment is ordinarily limited to the grounds assigned by the trial court." *Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship*, 327 Md. 536, 545 n.5 (1992) (citations omitted). It would, therefore, be inappropriate for this Court to resolve the legal viability of Appellants' first theory of negligence—particularly when material facts appear to remain in dispute. We explain.

**A Reasonably Foreseeable Dangerous Condition**

Appellants contend that it was improper for the circuit court to grant summary judgment based only on Appellees' notice of the specific crowd surge that caused the injury because Appellants' complaint also alleged that "Appellees failed to reasonably anticipate the foreseeable danger posed to attendees of the Ravens' Victory Day parade by uncontrolled crowds at the stadium; failed to undertake reasonable security and crowd management efforts; and created the dangerous condition that gave rise to the unabated crowd surge." They maintain that a reasonable inference exists that Appellees' failure to employ the same staffing levels, equipment, and crowd control measures typically used on

19

game days made the crowd surges possible. Appellants assert that the crowd surges were "foreseeable dangers" resulting from Appellees' failures.

Appellees respond that the facts create no inference that Appellees created the dangerous condition. Specifically, Ravens LP asserts that the fact that it had closed the gates mitigated the need for additional security at the gates. And SAFE maintains that the fact that the Celebration was unticketed supports their decision to reduce staffing levels. SAFE and Ravens LP both also assert that Appellants' argument about lack of security is based purely on speculation and a *prima facie* case of negligence would require expert testimony on proper stadium security precautions or the need for security barriers—something Appellants did not offer here. According to SAFE, "the independent cause of Appellants' injuries was the fact that an unknown third party lifted the handle to Gate C, thereby allowing the crowd to force themselves through the closed gate which led to the subsequent sudden crowd surge." MSA uses similar reasoning, casting "the stampede at Gate C" as the independent, "unforeseeable event[.]"[7]

In assessing a premises liability negligence claim, "[t]he duty owed by a property

---

[7] Additionally, MSA distinguishes its conduct and liability as landlord from that of the other Appellees. It avers that the "undisputed facts establish conclusively that the Ravens were in control of the stadium for the post-parade event." With respect to its own ability to foresee the harm, MSA argues that none of the facts on which Appellants rely—the failure by the Ravens and SAFE to hold a pre-event meeting, the reduced security, and the failure to erect barriers—relate to any action or inaction by MSA. According to MSA, the Ravens had conducted unticketed events at the stadium before and there are no facts to suggest that the Ravens "would not conduct the post-parade event safely." As Mr. Conway of MSA acknowledged at his deposition, however, MSA's position is contradicted by Mr. Parr's assertion that securing the area outside of the gates is the responsibility of MSA, not SAFE. Because the circuit court's narrow opinion did not address this dispute of fact, we cannot decide this issue on appeal.

20

owner to someone on the property varies, depending upon the latter's legal status on the property at the time of the incident." *Richardson v. Nwadiuko*, 184 Md. App. 481, 489 (2009) (citations omitted). We have explained that the duty an owner owes to an invitee is much more significant than the duty owed to a licensee or trespasser:

> The highest duty is that owed to an invitee; it is the duty to "use reasonable and ordinary care to keep the premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for the invitee's own safety will not discover." By contrast, the landowner or occupier owes no duty to licensees or trespassers, except to abstain from willful or wanton misconduct or entrapment.

*Id.* (internal citations and brackets omitted). As did the circuit court, we will treat Appellants as invitees.[8]

As far back as 1935, the Court of Appeals declared it "a settled principle of law that one who invites another upon his premises, owes to the invitee the duty of exercising reasonable care to see that the premises upon which he is invited are reasonably safe." *Eyerly v. Baker*, 168 Md. 599, 694 (1935) (citations omitted). Specific to the duty of a

---

[8] An entrant can establish their status as an invitee "under one of two doctrines: (1) mutual benefit or (2) implied invitation." *Richardson*, 184 Md. App. at 489 (citations omitted). The mutual benefit theory focuses on the entrant's subjective intent and "whether the entrant intended to benefit the landowner in some manner[,]" generally by intending to purchase goods or services. *Id.* (citation omitted). Under the implied invitation theory, by contrast, the focus is on objective circumstances "such as custom, habitual acquiescence of the owner, the apparent holding out of the premises for a particular use by the public, or the general arrangement or design of the premises." *Id.* at 489-90 (citation omitted). We explained in *Deboy* that "[t]he gist" of the distinction between an implied invitee and a mere licensee is the landowner's "passive acquiescence" in the latter circumstance and his or her "direct or implied inducement" in the former. 167 Md. App. at 555-56. An implied invitee must not have acted on his or her own motives, but because the landowner's "acts or conduct" led the entrant "to believe that the premises were intended to be used in the manner in which he [or she] used them[.]" *Crown Cork & Seal Co. v. Kane*, 213 Md. 152, 160 (1957) (citation omitted).

21

business proprietor, the Court explained that the "storekeeper" has

> a positive affirmative duty to protect [business invitees], not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but against dangers which may be caused by the negligent acts of his employees, *or even of customers*, where, as a reasonably prudent person, he should have anticipated the possible occurrence and the probable results of such acts[.]

*Id.* (emphasis added). The Court in *Eyerly* offered the following example to help explain how, in the context of negligence, the terms "safe," "unsafe," and "dangerous" are relative:

> [W]hile the massing of great numbers of persons in a storeroom on a bargain day may be unsafe or even dangerous to those who join the rush, the danger is a natural and necessary incident of the occasion to which every one who attends contributes in some degree, and cannot justify imputing negligence to the storekeeper merely because he made the danger possible by issuing the invitation. But if he knew that the massing of many people in the storeroom would, because of some structural defect, be dangerous, negligence might be inferred either from the condition of the premises or from the invitation.

*Id.* at 695 (concluding that a worn rubber edge on a revolving door "afford[ed] some evidence of negligence in the management and maintenance of the door").

In *Mathis v. Atlantic Aircraft Distributors*, the Court of Appeals identified "some of the specific trends and elements" that influence the standard of care a business owes to an invitee. 216 Md. 262, 267-270 (1958). That case involved a patron injured at an airfield when he was struck by a plane trying unsuccessfully to maneuver between a gas truck and the gas pit where the patron stood. *Id.* at 265. The Court observed that liability may lie when "a proprietor has reason to suspect from past experience that a third party is likely to be negligent[.]" *Id.* at 268. The examples that the Court in *Mathis* looked to on this point related to crowd size: "when a crowd of people have been induced to gather on his premises, the pushing and jostling and shoving of the crowd are reasonably to be

22

anticipated, and the proprietor would be liable for any injuries resulting from the foreseeable acts of the crowd." *Id.* (citing *Dilley v. Balt. Transit Co.*, 183 Md. 557, 562 (1944) ("When a carrier has reason to anticipate the gathering of a large crowd at a station, it is bound to take such reasonable precautions as the condition to be anticipated may dictate to avert injury to a passenger by the rushing or crowding of the persons thus assembled.")).

The *Mathis* Court compared cases in which a proprietor invited an unusually large crowd to its premises to a case in which a customer was injured by pushing in "a crowd of *usual* size." *Id.* at 270 (comparing *State to Use of Birckhead v. Sammon*, 171 Md. 178, 190-96 (1936) (holding that it was a question for the jury whether an airport breached its standard of care by inviting children to visit an airfield for a toy balloon contest that was followed by an air show but provided extra security only for the balloon contest even though the visitors remained after ordinary aircraft traffic resumed) with *Fenasci v. S.H. Kress & Co.*, 134 So. 779 (La. Ct. App. 1931) (holding that a merchant was not negligent when a customer pushed through a glass window in a crowd that was "not unusually large, and not any larger than the regular Saturday afternoon congregation of shoppers")). Ultimately, the Court in *Mathis* determined that, although it was a busy Saturday at the airport when the plaintiff's injury occurred, "there was no unusual crowd," and "it was only a normal Saturday afternoon." 216 Md. at 269.

One of the cases the Court in *Mathis* relied on that featured an unusually large crowd was *Taylor v. Pennsylvania Company*, 50 F. 755, 756 (C.C.N.D. Ohio 1892). Taylor was injured by a crowd surge at a train station when the defendant had "extensively advertised"

a celebration. *Id.* The federal court of appeals ruled that the trial judge properly instructed the jury that the proprietor "was only bound to furnish such suitable number of officers and guards as would insure order, and preserve the peace, and keep the crowd in proper control, so as to direct their movements toward[] the train"—whether the number of officers and guards was suitable was a jury question. *Id.* at 758. The jury found in favor of Taylor and awarded her damages. *Id.*

In upholding the sufficiency of the evidence against the defendant, the court reasoned that the defendant solicited the extraordinarily large crowd and "had all the means within its power necessary to keep it[self] advised of the rapid increase in the numbers of passengers coming on every train and from every direction." *Id.* at 758-59. Despite the defendant having the "capacities and facilities for handling crowds," the court determined that the defendant permitted the crowd "to become too dense for proper control or safe exit," and affirmed the jury's verdict. *Id.* at 759; *cf. Zacher v. Harrah's New Orleans Mgmt. Co.*, 136 So. 3d 132, 149–50 (La. Ct. App. 2014) (holding that the record evidence did not support an inference that Harrah's provided inadequate security for an event following a Super Bowl victory parade because Harrah's "*supplement[ed]* its security personnel for the day of the Party") (emphasis added).

We return to the case at bar and apply the principles and reasoning embodied in the foregoing cases. The circuit court found that Appellees did not have notice of a crowd surge and, in so doing, disposed of Appellants' theory of negligence based on the allegation that once the "unprecedented public crowd" arrived at the stadium, Appellees failed to reasonably endeavor to eliminate the possibility of a crowd surge at Gate C or warn

24

Appellants of an existing danger. The court relied, appropriately, on this Court's decision in *Rehn,* in which we held that a business proprietor could not be held liable for failing to prevent the plaintiff from falling right after another patron spilled soda on the floor because the evidence showed that the proprietor did not learn of the spill in time to remove it or warn the plaintiff. 153 Md. App. at 593. But the court erred in this case by granting the motions for summary judgment without addressing the Appellants' alternative theory of negligence and resolving whether disputes of material fact exist with respect to that alternative theory.

The trial court did not address Appellants' charge that their injuries resulted from a danger that was reasonably foreseeable because Appellees decided to host an unticketed and highly publicized Super Bowl celebration that would draw large crowds, and then allegedly failed to provide adequate crowd controls. Appellants argued before the circuit court that Appellees should have staffed the Celebration as they would have for any other full-stadium event, rather than with a "scaled-down crowd management and security force." Record evidence suggests that leadership within Ravens LP had vastly different expectations for how many guests to anticipate at the Celebration. Mr. Sommerhof, Ravens LP's Senior Vice President of Stadium Operations, admitted that he believed there would "be around 70,000 guests," even though most of the leadership in Ravens LP believed there would be only about 30,000-35,000. It is unclear from the record on appeal which estimate was reasonable or even whether Ravens LP's incorrect estimation affected decisions relating to staffing levels. What is clear, however, is that whether the crowd that was invited to the Celebration was "unusually large" is material to the question of negligence.

25

*See Mathis*, 216 Md. at 269-71.

Appellants also maintain that the standard of care should be based on Appellees' past practice for sold-out events. Accordingly, they contend that Appellees should have used barriers outside of the gates to queue the lines of guests waiting to enter. SAFE, on the other hand, maintains that reducing staffing levels was appropriate because there were no tickets for staff to check, and that it typically removes barriers by the gates after the event begins. Appellees insist that Appellants require expert testimony to prove otherwise. Perhaps expert testimony would be necessary to establish the adequate level of staffing at an unticketed championship celebration, or perhaps the circumstantial evidence may be such that a jury could reasonably conclude that, whatever the proper level, the staffing actually provided by Appellees was inadequate. *See Taylor*, 50 F. at 756 (holding that, in a trial where no expert testified, whether the defendant provided adequate security for an "extensively advertised" celebration was a question for the jury); *but cf. Sewell v. State*, 239 Md. App. 571, 606-08, 614 & n.12 (2018) (discussing the sufficiency of incidences of circumstantial evidence viewed collectively and the need for expert testimony on matters beyond the ken of a lay juror). In any case, the reasonableness of reducing staffing levels while amassing the equivalent to (and, as it turned out, more than) a sell-out crowd at the stadium is also material to the question of Appellees' negligence. *See Eyerly*, 168 Md. at 694.

The circuit court erred by ignoring material issues of fact that related to whether a crowd of the size that attended the stadium event was reasonably foreseeable and could create a risk of the type of harm suffered by Appellants, and whether Appellees took

reasonable precautions necessary to control the crowd they invited to the stadium. *See Deboy*, 167 Md. App. at 554. Moreover, to the extent these facts, as pleaded, were in equipoise, the circuit court was, of course, to view them in the light most favorable to Appellants, the non-moving party. *See id*. These factual disputes are not, however, for us to resolve in the first instance. *Beckenheimer's*, 327 Md. at 545 n.5. Accordingly, we must reverse the circuit court's entries of summary judgment and remand the case.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**